# IN THE SUPREME COURT OF CALIFORNIA

DEV ANAND OMAN et al.,
Plaintiffs and Appellants,

v.

DELTA AIR LINES, INC.,
Defendant and Respondent.

S248726

Ninth Circuit
17-15124

Northern District of California
3:15-cv-00131-WHO

---

June 29, 2020

This opinion follows companion case S248702,
also filed on June 29, 2020.

Justice Kruger authored the opinion of the Court, in which
Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu,
Cuéllar, and Groban concurred.

Justice Liu filed a concurring opinion, in which Justice Cuéllar
concurred.

---

OMAN v. DELTA AIR LINES, INC.

S248726

Opinion of the Court by Kruger, J.

In this case, as in the companion cases *Ward v. United Airlines, Inc.*, and *Vidrio v. United Airlines, Inc.* (June 29, 2020, S248702) ___ Cal.5th ___ (*Ward*), we confront a question about the application of various California wage and hour laws to flight attendants who work primarily outside California's territorial jurisdiction. Consistent with our holding in those cases, we conclude that California's wage statement laws apply only to flight attendants who have their base of work operations in California, and that the same is true of California laws governing the timing of wage payments. Finally, we hold that, whether or not California's minimum wage laws apply to work performed on the ground during the flight attendants' brief and episodic stops in California, the pay scheme challenged here complies with the state requirement that employers pay their employees at least the minimum wage for all hours worked.

**I.**

Defendant Delta Air Lines, Inc., is a national and international air carrier incorporated in Delaware and based in Georgia. Delta offers service in and out of roughly one dozen California airports, connecting cities as small as Palm Springs and as large as Los Angeles to the rest of the country and the world.

Plaintiffs Dev Anand Oman, Todd Eichmann, Michael Lehr, and Albert Flores are or were flight attendants for Delta.

Oman lived in New York and had a New York airport as a home base. Lehr lives in Nevada but has a California airport as his home base. Eichmann and Flores both live in California and have California airports as their home bases. All four employees have served on flights in and out of California airports, as well as airports outside the state.

In 2015, the named plaintiffs (collectively Oman) filed a putative class action in federal court, alleging that Delta violates California labor law by failing to pay its flight attendants at least the minimum wage for all hours worked. According to the operative complaint, Delta's published work rules (hereafter Work Rules) pay flight attendants pursuant to formulas that compensate them on an hourly basis for certain hours worked but fail to provide any compensation at all for other working hours, in contravention of an obligation under California statutory and regulatory law to pay no less than the minimum wage for every hour worked. (See Lab. Code, §§ 1182.12, 1194, 1194.2; Industrial Welfare Commission (IWC) wage order No. 9–2001, § 4 (Wage Order No. 9).) Oman also alleged Delta fails to pay all wages in accordance with the semimonthly timeframe prescribed by Labor Code section 204 (section 204) and to provide comprehensive wage statements reporting hours worked and applicable hourly pay rates, as required by California's wage statement statute, Labor Code section 226 (section 226). Oman sought relief under these statutes, as well as civil penalties under the Labor Code Private Attorneys General Act of 2004 (Lab. Code, § 2698 et seq.) and restitution and injunctive relief under the unfair competition law (Bus. & Prof. Code, § 17200 et seq.).

On cross-motions for summary judgment, the district court concluded Delta's pay scheme does not violate California's

minimum wage requirements. (*Oman v. Delta Air Lines, Inc.* (N.D.Cal. 2015) 153 F.Supp.3d 1094, 1095.) Oman argued that Delta fails to pay any compensation at all for certain hours worked in California and, under *Gonzalez v. Downtown LA Motors, LP* (2013) 215 Cal.App.4th 36 (*Gonzalez*) and *Armenta v. Osmose, Inc.* (2005) 135 Cal.App.4th 314 (*Armenta*), Delta is prohibited from borrowing compensation due for other hours worked to make up for any shortfall. The district court examined the pay formulas set out by Delta's Work Rules and concluded they adequately compensate flight attendants for all hours worked, without any impermissible borrowing or reduction in agreed-to contractual rates. (*Oman, supra,* 153 F.Supp.3d at pp. 1102–1107.)

The parties then filed cross-motions for summary judgment on Oman's remaining wage statement and timing claims. The district court granted judgment in favor of Delta, concluding that the relevant California statutes, sections 204 and 226, do not apply to Oman. The court held that the jurisdictional reach of the statutes should be determined according to a multifactor analysis that examines "the particular Labor Code provision invoked, the nature of the work being performed, the amount of work being performed in California, and the residence of the plaintiff and the employer." (*Oman v. Delta Air Lines, Inc.* (N.D.Cal. 2017) 230 F.Supp.3d 986, 992–993.) Here, "[f]ocusing on the purpose of Section 226 (to give employees clarity as to how their wages are calculated, so they can verify that their wages are calculated appropriately *under* California law), because the undisputed facts show that the named plaintiffs only worked a *de minimis* amount of time in California (ranging from 2.6% to a high of 14%), and in light of the nature of their work (necessarily working in federal

airspace as well as in multiple other jurisdictions but during each pay period *and day* at issue),” the court concluded that section 226 does not apply to Oman’s claims. (*Oman, supra,* 230 F.Supp.3d at p. 993, fn. omitted.) Seeing no argument for a different result under section 204, and because plaintiffs’ counsel had conceded the statute should have a similar scope, the district court likewise rejected Oman’s section 204 claims. (*Oman,* at p. 994.)

On appeal, the Ninth Circuit asked that we resolve three unsettled questions of California law underlying Oman’s claims. (*Oman v. Delta Air Lines, Inc.* (9th Cir. 2018) 889 F.3d 1075, 1076–1077.) We accepted the request and agreed to resolve the following issues:[1]

(1)   Do sections 204 and 226 apply to wage payments and wage statements provided by an out-of-state employer to an employee who, in the relevant pay period, works in California only episodically and for less than a day at a time?

(2)   Does California minimum wage law apply to all work performed in California for an out-of-state employer by an employee who works in California only episodically and for less than a day at a time? (See Lab. Code, §§ 1182.12, 1194; Cal. Code Regs., tit. 8, § 11090, subd. (4).)

(3)   Does the *Armenta/Gonzalez* bar on averaging wages (see *Armenta, supra,* 135 Cal.App.4th 314; *Gonzalez, supra,* 215 Cal.App.4th 36) apply to a pay formula that generally awards credit for all hours on duty, but which, in certain situations

---

[1]   We have reframed these inquiries slightly. (Cal. Rules of Court, rule 8.548(f)(5).)

resulting in higher pay, does not award credit for all hours on duty?

## II.

## A.

Our precedent makes clear that the application of California wage and hour protections to multistate workers like Oman may vary on a statute-by-statute basis. (See *Sullivan v. Oracle Corp.* (2011) 51 Cal.4th 1191, 1201 (*Sullivan*).) We thus consider separately each of the wage and hour statutes on which Oman relies, beginning with section 226. That provision requires an employer to supply each employee "semimonthly or at the time of each payment" a written wage statement disclosing the pay period and itemizing the hours worked, applicable hourly rates, gross and net wages earned, any deductions taken, and other relevant information. (§ 226, subd. (a).)

As we explained in *Ward*, *supra*, ___ Cal.5th ___, section 226 does not, in so many words, define its geographic reach. (*Ward*, at p. ___ [p. 21].) But we ordinarily presume the Legislature drafts laws with domestic conditions in mind (*id.* at p. ___ [p. 16]), and thus requires some degree of connection between the subject matter of the statutory claim and the State of California. In *Ward*, we addressed the nature of the connection required to trigger the wage statement requirements set forth in section 226 and held that section 226 applies when an employee's principal place of work is in California. Ordinarily, this test is met if an employee works primarily (i.e., the majority of the time) in California. In the case of interstate transportation workers and others who do not spend a majority of their working time in any one state, this test is satisfied when

California serves as their base of work operations. (*Ward*, at pp. ___–___ [pp. 26–28].) Under this rule, because plaintiffs here never worked more than half the time in California (or in any other state), whether they are entitled to California-compliant wage statements hinges on whether they were based for work purposes in California.

The Ninth Circuit's question in this case appears to ask whether it is also relevant that Delta is a nonresident corporation. Delta now concedes that its foreign domicile does not foreclose the application of state law. We accept the concession. Section 226 contains no exemption based on the employer's location. This is in contrast to, for example, the worker's compensation scheme, which expressly exempts some out-of-state employers. (See Lab. Code, § 3600.5, subd. (b); *Sullivan*, *supra*, 51 Cal.4th at pp. 1197–1198.) The state's power to protect employees within its borders is not limited by whether the worker might be a nonresident or might be employed by a nonresident entity. (*North Alaska Salmon Co. v. Pillsbury* (1916) 174 Cal. 1, 5; see *Kearney v. Salomon Smith Barney, Inc.* (2006) 39 Cal.4th 95, 105 ["individual states may adopt distinct policies to protect their own residents and generally may apply those policies to businesses that choose to conduct business within that state"].) Instead, the onus ordinarily is on "a company that conducts business in numerous states . . . to make itself aware of and comply with the law of a state in which it chooses to do business." (*Kearney*, at p. 105.) To hold otherwise would, as Delta suggests, create an incentive for businesses employing individuals who work in California to avoid application of California law by locating their business operations outside the state. If employees are based for work purposes in California, that is sufficient to trigger the

requirements of section 226, regardless of where their employer resides.

The proposed class in this case includes individuals who, like New York-based Dev Oman, neither perform their work predominantly in California nor are based for work purposes in the state. Oman urges us to apply a different rule than the one we have articulated in *Ward*. Although the operative complaint does not so specify, Oman clarifies in his briefing that unlike the *Ward* plaintiffs he does not seek comprehensive wage statements documenting all wages earned during a pay period. He argues instead that section 226 ought to be interpreted to require California-compliant documentation for those hours, however few they might be during any given pay period, when he worked on the ground in California. He contends this requirement should apply to any airline employee who ever works in California, even those who are based out of state.

This argument fails under the terms of section 226. Section 226 provides for the documentation of wages and other information over an entire pay period, not fractions thereof. A wage statement must specify not only "total hours worked" and "all applicable hourly rates," but also "gross wages," "net wages," and "all deductions" for the full period. (§ 226, subd. (a).) The statute contains no indication that the employer of an out-of-state worker must report fractions of wages earned during brief trips to the state, as well as attempt to calculate the fraction of wage deductions attributable to these sojourns. The statute requires "an accurate itemized statement" reflecting "the inclusive dates of the period for which the employee is paid" and all relevant information concerning the employee's pay during that period—that is, a single comprehensive statement of pay. (*Ibid*.)

Oman argues that our recent decision in *Troester v. Starbucks Corp.* (2018) 5 Cal.5th 829 supports his proposed fractional approach, but *Troester* has nothing to do with the question before us. There, stressing that the IWC's wage orders ensure compensation for " 'all hours worked' " (*Troester*, at p. 840, quoting IWC wage order No. 5–2001, §§ 3(A), 4(A)), we rejected the contention that state wage law would not concern itself with unpaid work on the order of a few minutes a day. Instead, we held that an "employer that requires its employees to work minutes off the clock on a regular basis or as a regular feature of the job may not evade the obligation to compensate the employee for that time by invoking the de minimis doctrine." (*Troester*, at p. 847.) That holding has no relevance here. The issue before us is not whether brief periods of work must be compensated—no one disputes the point—but whether a few minutes or hours of work in California necessarily trigger the detailed pay-period documentation requirements of California law. The answer to that question is no: Employees are entitled to California-compliant wage statements only if California is the principal place of their work.

Oman also argues that an approach based on the principal place of work will prove unworkable because coverage can only be determined in retrospect. But there is nothing unworkable about it. Wage statements are, of necessity, prepared in retrospect; their function is to record hours already worked and wages already earned. And if the location of an employee's job duties shifts radically during the course of employment—if, for example, a flight attendant takes on a new job as a gate agent at Los Angeles International Airport—the employer will have ample opportunity to adjust. Likewise, if the employee's base of operations changes because the employee is assigned to a

different home airport, it will be a small matter to determine whether section 226 now applies.

It is, in the end, Oman's approach that poses greater practical concerns. By insisting on California-compliant wage statements, but only for the fraction of hours worked on the ground in California, Oman would effectively require that employers either (1) accompany each California-specific wage statement with multiple similar separate statements under the laws of each and every additional state in which an employee worked during a pay period, or (2) issue a single wage statement, but allow California law effectively to dictate the form and contents for documenting work predominantly performed in foreign jurisdictions. The first option would undermine the very purpose of section 226, which is "to ensure an employer 'document[s] the basis of the employee compensation payments' to assist the employee in determining whether he or she has been compensated properly." (*Soto v. Motel 6 Operating, L.P.* (2016) 4 Cal.App.5th 385, 390, quoting *Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 574.) This informational purpose would be ill-served by a rule that led to employees receiving a blizzard of wage statements every pay period, each documenting only a state-specific sliver of their work, and from this paper snowdrift trying to discern what they had actually been paid. As to the second option, allowing any work in California, no matter how fleeting, to effectively impose California law on documentation of all work in a pay period would raise the very sorts of conflict-of-laws problems we generally presume the Legislature seeks to avoid. (*Ward, supra,* ___ Cal.5th at pp. ___–___ [pp. 16–17].) It is presumably for this reason that Oman has avoided arguing that California law requires this result. We decline to construe section 226 as

putting employers to the choice of either issuing a single California-compliant wage statement for every interstate worker who works for any amount of time, however brief, within the state, or issuing a multiplicity of statements, when the statute envisions that employees will receive just one.

The principal place of work rule we have articulated in *Ward* means that some short periods of work in California will not be covered by section 226's documentation requirements. Conversely, some periods of work outside California *will* be covered, if they occur as part of an overall period in which most work occurs inside this state or are performed by an employee who primarily works in no state but is based here. Such consequences are inevitable and unavoidable in a nation of 50 states where some forms of employment stretch across the land. But an understanding of section 226 that focuses on the principal place of an employee's work both serves the informational purposes the Legislature sought to achieve and minimizes the inevitable complications that would result from a rule that any work in one state, no matter how fleeting, is sufficient to trigger application of that state's wage reporting laws.

We thus conclude section 226 does not apply to work performed in California during pay periods in which the employee, based outside California, works primarily outside California. A non-California-based employee who works in California "only episodically and for less than a day at a time" (*Oman v. Delta Air Lines, Inc.*, *supra*, 889 F.3d at p. 1077) is not entitled to a wage statement prepared according to the requirements of California law.

**B.**

We turn now to Oman's section 204 claim. That statute guarantees employees full payment on a semimonthly basis, providing: "All wages," with certain exceptions not relevant here, "earned by any person in any employment are due and payable twice during each calendar month, on days designated in advance by the employer as the regular paydays." (§ 204, subd. (a).) Section 204 goes on to establish specific deadlines by which wage payments must be made. (*Id.*, subd. (a).)[2] As is true of section 226, nothing in the statute explicitly specifies its intended geographic scope.

As Oman conceded in the federal district court (see *Oman v. Delta Air Lines, Inc.*, *supra*, 230 F.Supp.3d at p. 994), there is no reason to interpret section 204's geographic coverage differently from that of section 226. That is because section 204 works hand in hand with section 226. Section 226 regulates the information an employer must provide in connection with wage payments, while section 204 regulates when an employer must pay an employee for hours worked. The Legislature has recognized that when an employee must be paid (the subject of § 204), and what information must accompany each such required payment (the subject of § 226) are necessarily linked. (See § 204, subd. (b)(2) [coordinating the application of these provisions].)

---

[2]    With certain exceptions not relevant here, "[l]abor performed between the 1st and 15th days, inclusive, of any calendar month shall be paid for between the 16th and the 26th day of the month during which the labor was performed, and labor performed between the 16th and the last day, inclusive, of any calendar month, shall be paid for between the 1st and 10th day of the following month." (§ 204, subd. (a).)

As with section 226, Oman seeks to apply section 204 only to those hours he worked within California. And as with section 226, reading the statute as Oman argues would pose difficulties that prove fatal to the argument. Again, there are two options: Either the employer must calculate and split out some portion of the wages due as attributable to work performed in California and pay only those on section 204's schedule, while paying other wages due in accord with whatever timing statutes might apply under other states' laws, or the employer must pay all wages due according to the schedule required under California law by section 204. These interpretations present the same issues as the corresponding options for complying with section 226.

The first interpretation, aside from the administrative headaches it would generate, runs headlong into the text of section 204, which applies to "[*a*]*ll* wages . . . earned," with exceptions not significant here. (§ 204, subd. (a), italics added.) As with section 226, nothing in the text suggests the Legislature contemplated fragmenting wages earned according to the state in which labor was performed and requiring whatever sliver of wages might be attributable to California to be paid on section 204's timeline, with other slivers for work elsewhere paid according to whatever other state law might apply. Nor is it clear how such a reading would advance the policy underlying section 204. Section 204 serves the "public policy in favor of full and prompt payment of an employee's earned wages," which "is fundamental and well established: ' "Delay of payment or loss of wages results in deprivation of the necessities of life, suffering inability to meet just obligations to others, and, in many cases may make the wage-earner a charge upon the public." ' " (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 82, quoting *Kerr's Catering Service v. Department of Industrial Relations* (1962) 57

Cal.2d 319, 326; see *Voris v. Lampert* (2019) 7 Cal.5th 1141, 1148 ["prompt and complete wage payments are of critical importance to the well-being of workers, their families, and the public at large"].) Section 204, insofar as it applies to the entirety of an employee's wages, directly serves this policy. It is less apparent how the policy is meaningfully advanced by requiring payment of California-earned wages on a California-specified timeline when those wages represent just a small fraction of the earnings an employee relies on for support.

The second interpretation accords section 204 a broad reach, allowing California law to dictate the timing of payment for wages earned predominantly outside California for work performed outside California. Granting section 204 such an expansive scope would generate significant complications. Given the nature of the flight attendants' work, treating any work performed on the ground in any given state as sufficient to trigger application of payment timing requirements could subject the payment for work in a given pay period to the often-conflicting laws of a dozen or more states. Reading section 204 in concert with section 226 as applying to pay periods in which an employee works predominantly in California avoids these problems.

In sum, we conclude section 204 is subject to the same limits as section 226 and applies only to pay periods during which an employee predominantly works inside California.

## III.

We turn, finally, to the minimum wage claims. The Ninth Circuit asks two questions related to these claims: First, whether California minimum wage law applies to the hours (or fractions thereof) that Oman worked on the ground in

California, and second, whether Delta's method of computing Oman's wages complies with the state law.  As discussed, the application of labor protections must be analyzed on a provision by provision basis in light of the nature of the protection afforded, and so the rules we articulate for sections 204 and 226 do not resolve whether the state's minimum wage laws might apply.  (See *Ward, supra*, ___ Cal.5th at pp. ___, ___ & fn. 10 [pp. 21, 28 & fn. 10]; *Sullivan, supra*, 51 Cal.4th at p. 1201; *ante*, at p. ___ [p. 5].)  But we need not settle the reach of the state's minimum wage laws if we can determine that, even were those laws to apply, Delta's pay scheme would not violate them.  Because the record establishes Delta complies with state minimum wage law, we address only that question.

Like other industry wage orders, Wage Order No. 9 requires that "[e]very employer shall pay to each employee, on the established payday for the period involved, not less than the applicable minimum wage for all hours worked in the payroll period, whether the remuneration is measured by time, piece, commission, or otherwise." (*Id.*, § 4(B).)  Here, pursuant to the Work Rules, the remuneration provided to Delta flight attendants is measured by the "rotation," a given sequence of flights over a day or a period of days that the attendant will serve on.  Compensation for each rotation is calculated according to four different formulas; flight attendants are paid according to whichever formula yields the largest amount for the complete rotation. (See *post*, at pp. 22–23.)  It is undisputed that under this compensation scheme, flight attendants are always paid, on an hourly average, above the minimum wage.  Oman contends that the scheme nonetheless violates California's minimum wage law, principally because one of Delta's four formulas—the formula that most often determines how much

flight attendants will be paid, because it generally yields the greatest compensation—is based solely on flight time and does not factor in the hours flight attendants spend working on the ground before and after flights.

The dispute between the parties does not concern the substance of California's minimum wage guarantee. It is common ground that the law guarantees at least minimum wage for "all hours worked in the payroll period." (Wage Order No. 9, § 4(B).) The parties' disagreement instead concerns how compliance is to be measured when the employer does not compensate its employees according to a fixed hourly rate applicable to all hours.

## A.

To understand the nature of the dispute, some background is required. Beginning several decades ago, federal courts confronting questions about minimum wage compliance commonly interpreted federal law to require only that employers pay in each week an average wage at or above the federal minimum. (See 29 U.S.C. § 206(a); *U.S. v. Klinghoffer Bros. Realty Corp.* (2d Cir. 1960) 285 F.2d 487, 490; see also, e.g., *Dove v. Coupe* (D.C. Cir. 1985) 759 F.2d 167, 171–172 (opn. of Ginsburg, J.).) At least without further refinement, the workweek-average approach means that if an employer agrees to pay a particular amount for say, 20 hours of work in a week, but then demands the employee work an additional 10 hours for free, the minimum wage law is satisfied so long as the total wages, divided by 30, equal or exceed the applicable minimum wage. Under this approach, Delta's compensation scheme could create no possible problems, since, as noted, it is undisputed

that the scheme yields an average hourly wage that well exceeds the minimum set by California law.

The Division of Labor Standards Enforcement (DLSE) and the unanimous Courts of Appeal, however, have embraced a more stringent understanding of state law that forbids taking compensation contractually due for one set of hours and spreading it over other, otherwise un- or undercompensated, hours to satisfy the minimum wage—a practice that has often, perhaps misleadingly, been referred to as "wage averaging." As we will explain, the practice these authorities prohibit might be more accurately characterized as "wage borrowing," and we employ that phraseology here.

The DLSE was first to consider the issue. (See Dept. of Industrial Relations, DLSE Opn. Letter No. 2002.01.29 (Jan. 29, 2002) (hereafter DLSE Opinion Letter No. 2002.01.29).) In response to a question by parties to a collective bargaining agreement, the DLSE determined that particular employee travel time for which no compensation was being paid, because the employer apparently viewed it as off-duty and noncompensable, was in fact on-duty hours worked and compensable. (*Id.* at pp. 1–7.) The DLSE then considered whether payments for other compensable hours, contractually promised under the collective bargaining agreement, could be borrowed to satisfy the employer's minimum wage obligations, as would have been true under the rule generally articulated in the federal courts.

The DLSE viewed the language of the wage order as ambiguous, so it turned to the statutory backdrop for answers. California law, the DLSE observed, differs from federal law in that it not only guarantees a minimum wage but also expressly

protects employees' right to receive the wages promised in a contract or collective bargaining agreement. Specifically, Labor Code section 221 prohibits an employer from paying wages and then recouping some portion of the wages as a kickback or secret deduction;[3] Labor Code section 222 prohibits underpayment of wages established by a collective bargaining agreement;[4] and Labor Code section 223 prohibits underpayment of wages otherwise established by contract.[5] Wage borrowing would violate these statutes by reducing compensation, for the hours from which wages were borrowed, below the contractually agreed-upon level. (DLSE Opn. Letter No. 2002.01.29, *supra*, at p. 11 ["These statutes prevent [an] employer that might be covered by a [collective bargaining agreement (CBA)] or other contract that expressly pays employees less than the minimum wage for certain activities that constitute 'hours worked' within the meaning of state law, from using any part of the wage payments that are required under that CBA or other contract for activities that are compensated in an amount that equals or exceeds the minimum wage, as a credit for satisfying minimum

---

[3] "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." (Lab. Code, § 221; see *Kerr's Catering Service v. Department of Industrial Relations, supra*, 57 Cal.2d at p. 328.)

[4] "It shall be unlawful, in case of any wage agreement arrived at through collective bargaining, either wilfully or unlawfully or with intent to defraud an employee, a competitor, or any other person, to withhold from said employee any part of the wage agreed upon." (Lab. Code, § 222.)

[5] "Where any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract." (Lab. Code, § 223.)

wage obligations for those activities that are compensated at less than the minimum wage under the CBA or contract" (fn. omitted)].) In practical terms, this means that an employer who contracts to pay $18 per hour for two hours of work, but who then demands a third hour of unpaid work, cannot argue that it has complied with a $12 hourly minimum wage (see, e.g., Lab. Code, § 1182.12, subd. (b)(1)(C), (2)(C)) because it has paid $36 over three hours, or $12 per hour. Under the DLSE's interpretation of the Labor Code, the employer must pay the full $18 required by contract for the first two hours. Then, for the third uncontracted-for hour for which no compensation was promised, it must pay no less than the applicable minimum wage.

The Court of Appeal in *Armenta, supra*, 135 Cal.App.4th 314, endorsed the DLSE's reasoning in a similar context. The employer in *Armenta*, which maintained utility poles, had promised in a collective bargaining agreement to pay set hourly rates for hours spent engaged in "productive" tasks directly related to pole maintenance. But employees were required to engage in other, "nonproductive" activities, such as travel time and paperwork, for which they received no compensation. (*Id.* at p. 317.) The court held this unlawful, notwithstanding the fact that the average of the paid and unpaid hours exceeded the minimum wage. The court reasoned that an employer who promises to compensate particular hours worked at a particular rate cannot borrow some of that compensation and apply it to other compensable hours for which no compensation is provided. To do so would effectively compel an employee to sacrifice contractually promised compensation and breach the employer's contractual commitments, in violation of either Labor Code section 222 (governing collective bargaining agreements) or

Labor Code section 223 (governing ordinary contracts). (See *Armenta*, at p. 323 [averaging pay across any uncompensated hours "contravenes these code sections and effectively reduces [the employee's] contractual hourly rate"].)

Since *Armenta*, other Courts of Appeal have uniformly followed its lead. These decisions have extended the no-borrowing rule to employees under a collective bargaining agreement (*Bluford v. Safeway Inc.* (2013) 216 Cal.App.4th 864, 872–873 (*Bluford*)) and an ordinary contract (*Gonzalez, supra*, 215 Cal.App.4th at pp. 50–51), and without regard to whether the basis for compensation is hourly (*Sheppard v. North Orange County Regional Occupational Program* (2010) 191 Cal.App.4th 289, 297–298, fn. 5), by piece rate (*Bluford*, at p. 872; *Gonzalez*, at pp. 51–52), or by commission (*Vaquero v. Stoneledge Furniture, LLC* (2017) 9 Cal.App.5th 98, 108–114 (*Vaquero*)). Although we have not previously had occasion to address the issue, we agree with this consensus: State law prohibits borrowing compensation contractually owed for one set of hours or tasks to rectify compensation below the minimum wage for a second set of hours or tasks, regardless of whether the average of paid and unpaid (or underpaid) time exceeds the minimum wage. Even if that practice nominally might be thought to satisfy the requirement to pay at least minimum wage for each hour worked, it does so only at the expense of reneging on the employer's contractual commitments, in violation of the contract protection provisions of the Labor Code.

Synthesizing the authorities, we summarize the principles this way. The compensation owed employees is a matter determined primarily by contract. Compensation may be calculated on a variety of bases: Although nonexempt employee pay is often by the hour, state law expressly authorizes

employers to calculate compensation by the task or piece, by the sale, or by any other convenient standard. (See Lab. Code, § 200, subd. (a) [compensation may be "fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation"]; Wage Order No. 9, § 4(B) [compensation may be "measured by time, piece, commission, or otherwise"].) In many employment agreements, such as the one at issue in *Armenta*, the unit of time or activity by which an employer promises to pay an employee is easily ascertainable. (See *Armenta*, *supra*, 135 Cal.App.4th at p. 317 ["Under the terms of the parties' collective bargaining agreement, respondents were paid hourly wages . . . ."].) In other cases, the employer may compensate employees based on a combination of methods. (See, e.g., *Vaquero*, *supra*, 9 Cal.App.5th at p. 103 [compensation determined by the greater of sales commission or hourly minimum pay]; *Gonzalez*, *supra*, 215 Cal.App.4th at p. 41 [compensation determined by greater of repair tasks completed or minimum hourly pay].) Consistent with general contract interpretation principles, the unit for which pay is promised should be determined based on the "mutual intention of the parties as it existed at the time of contracting." (Civ. Code, § 1636.)

Whatever the task or period promised as a basis for compensation, however, an employer must pay no less than the minimum wage for all hours worked. (See Wage Order No. 9, §§ 2(H), 4.) The employer must satisfy this obligation while still keeping any promises it has made to provide particular amounts of compensation for particular tasks or periods of work. (Lab. Code, §§ 221–223.) For all hours worked, employees are entitled to the greater of the (1) amount guaranteed by contract for the specified task or period, or (2) the amount guaranteed by the

minimum wage. Whether a particular compensation scheme complies with these obligations may be thought of as involving two separate inquiries. First, for each task or period covered by the contract, is the employee paid at or above the minimum wage? Second, are there other tasks or periods not covered by the contract, but within the definition of hours worked, for which at least the minimum wage should have been paid?

For purposes of evaluating whether an employee has received at least the hourly minimum wage for tasks or periods compensated under the contract, it is generally permissible to translate the contractual compensation—whether it be done by task, work period, or other reasonable basis—into an hourly rate by averaging pay across those tasks or periods. An employer can, for example, pay by the day, with daily pay averaged across all hours worked to determine whether the resulting hourly wage exceeds the minimum. But an employer who instead promises to pay by the hour may not compensate any given hour at less than minimum wage. Nor may the employer make up for the shortfall by pointing to other hours for which contractual compensation exceeds the minimum wage. As the DLSE explained in its letter, if a contract or bargaining agreement expressly guarantees compensation for one set of tasks or one specific period, that compensation may not be reduced to supplement pay for other tasks or periods within the purview of the contract or bargaining agreement, but otherwise undercompensated by them. (DLSE Opn. Letter No. 2002.01.29, *supra*, at p. 11; Lab. Code, §§ 221–223.)

The same "no borrowing" principle applies when an employer requires work not covered by the contract at all, but which falls within the definition of hours worked under the minimum wage law. So, for example, in *Armenta, supra*, 135

Cal.App.4th 314, the collective bargaining agreement ensured pay at or above the minimum wage for hours engaged in specified productive tasks, and under the agreement and Labor Code section 222, the employees were entitled to their promised wages without diminution. But for other periods not compensated under the contract, but during which employees were on duty and thus owed compensation under the wage order, the minimum wage was also due.

## B.

So far, we have described common ground: Delta does not challenge the no-borrowing principle as it has been elaborated in the *Armenta* line of cases. The parties' disagreement concerns whether Delta's flight attendant compensation scheme violates this no-borrowing principle. Because the relevant provisions of the Labor Code prohibit borrowing only when it results in failure to maintain the wage scale designated by contract, the resolution necessarily turns on the nature of Delta's contractual commitments. (See Lab. Code, § 223 [prohibiting an employer from "secretly pay[ing] a lower wage while purporting to pay the wage designated . . . by contract"].)

Delta's Work Rules, which are disclosed to all its flight attendants, promise to compensate attendants by the rotation rather than by particular hours worked. This is evident both from the structure of the compensation scheme outlined in the Work Rules and the procedures Delta employees follow to obtain work assignments.

Each rotation contains one or more duty periods, interspersed with layovers between duty periods. A duty period begins when a flight attendant reports to an airport before a flight. Thereafter, the flight attendant may have preboarding

obligations, in-flight obligations, posttouchdown obligations, transit or sit time—the period in another airport before the next flight is ready for boarding—and a similar set of obligations during the next or each subsequent flight until the end of the duty period. As Delta acknowledges, flight attendants are on duty continuously during a duty period, from first reporting until release after the last flight of the period. For his part, Oman does not contend flight attendants are on duty or entitled to compensation for layovers between duty periods.

Under the Work Rules, compensation is first determined for each duty period within a rotation by comparing three calculations and choosing the highest pay from among these: "Each duty period of a rotation pays the greatest of: [¶] 1) flight time (includes deadhead flight time, minutes under, and flight pay for ground time), or [¶] 2) 4:45 minimum duty period credit (MDC), or [¶] 3) 1 for 2 duty period credit (DPC)." Second, the maximum pay for all duty periods within a rotation is summed and compared against a fourth formula based on the length of the rotation, and flight attendants are paid whichever of these two amounts is greater.[6] Thus, although hours worked, or credited, are elements in these successive computations and comparisons to determine an employee's pay, Delta does not promise to pay by the hour, nor does it promise to pay for certain hours and not others.

---

[6] Under this alternative rotation formula, "[t]he sum of the duty period credits listed above is then compared to 1 for 3.5 trip credit (TRP), which guarantees at least 1 hour pay for every 3.5 hours away from base. You will be paid the greater of the two values."

The promise to pay by rotation is also reflected in the procedures Delta uses for distributing work assignments. The nature of these procedures is undisputed: Each month, Delta circulates a bid packet to its flight attendants listing rotations each employee can request. The bid packet presents the number of duty periods and length of each duty period within each rotation; report times and total scheduled flight times for the flights within each rotation; and the amount of time the flight attendant can expect to be away from base. The bid packet also shows which formula will apply and the minimum amount flight attendants would be paid for the rotation at their particular contractually established "flight pay" rate. (See *Oman v. Delta Air Lines, Inc., supra*, 153 F.Supp.3d at pp. 1096–1098.) Flight attendants then submit their rotation preferences, with the understanding that their pay for each rotation will be no less than the amount derivable from the bid packet. That Delta pays flight attendants by the rotation, and what it will pay for any particular rotation, are fully disclosed. Delta then gives flight attendants access to electronic databases that track credits and pay earned for each assigned rotation.

Delta's four-formula method for calculating compensation guarantees that flight attendants are always paid above the minimum wage for the hours worked during each rotation without borrowing from compensation promised for other rotations. Under one of the four formulas—the one-for-two duty period credit formula—pay is calculated by multiplying the attendant's established flight pay rate by the total hours in the duty period, divided by two. To borrow the simple example contained in Delta's 2014 Work Rules, a flight attendant working a duty period that lasts 12.5 hours would receive 6.25 hours of credit at the flight pay rate—a rate that in 2014 ranged

from $23.28 to $53.52 depending on the employee's years of service. So long as the flight pay rate equals or exceeds twice the applicable minimum wage, this formula ensures a flight attendant is paid for all hours worked in every duty period at no less than the minimum wage. And because pay for a rotation is never less than the sum of the pay for each duty period, rotation pay also will always meet or exceed the hourly minimum wage.

Oman does not contend that any flight attendant's flight pay rate was ever less than twice the applicable minimum wage. But he nevertheless contends that the duty period credit formula fails to compensate flight attendants for all hours worked and instead compensates them for only half the hours worked—leaving the other half entirely uncompensated, contrary to state minimum wage law. Specifically, as Oman reads the Work Rules, the flight attendant working a 12.5-hour duty period is being paid for only half of that time, 6.25 hours, with the remaining 6.25 hours unpaid.

Oman's reading is unsound. The Work Rules do not, as he suggests, purport to compensate flight attendants only for every other hour—which is to say, they do not require a flight attendant to work an hour for free in order to earn full flight pay credit for working a second hour. Instead, flight pay credit accumulates continuously as the duration of the duty period lengthens: Every additional minute on duty earns an employee an additional 30 seconds of flight pay credit. As an example, a flight attendant subject to a $40 flight pay rate who works an eight-hour duty period would receive $160; for an 8.5-hour duty

period, $170; for a nine-hour duty period, $180; and so on.[7]  Each and every increment of on-duty time is compensated under the formula, and at a rate equal to or greater than the hourly minimum wage.  There is no impermissible borrowing from hours for which full flight pay was promised to cover hours for which no compensation is provided, both because every hour is compensated at the same rate (half flight pay) and because Delta never promised full flight pay for any particular hour under this formula.

The duty period credit formula is, however, only one of four formulas that may determine flight attendant compensation; if any one of the other formulas yields a greater amount of compensation, it will instead control.  Oman argues that when pay is based on one of these other formulas, Delta violates the state minimum wage law.

Oman focuses in particular on a second formula, the flight time formula, which supplies the measure of pay for most duty periods.  (*Oman v. Delta Air Lines, Inc.*, *supra*, 153 F.Supp.3d at pp. 1100–1101.)  Under this formula, an attendant is paid at the contractually established flight pay rate for each period between flight "block out" and "block in"—the period between when each flight departs the block, or gate, and arrives at the destination gate.  The established flight pay rate is multiplied by the longer of the scheduled flight time or the actual flight time.  Time

---

[7]  The same is true no matter what causes the duty period to extend.  If the same flight attendant with a $40 flight pay rate works a duty period consisting of flights in and out of San Francisco, and the second flight is delayed by fog, requiring additional sit time in San Francisco, the amount owed under the duty period credit formula will still rise, at the rate of $20 per hour, for every extra minute of delay.

between reporting for duty and the first flight block out, during any between-flights sit time, and after the last flight block in until release, is not directly factored into the calculation. For duty periods where the flight time comprises less than 50 percent of the total on-duty time, a flight attendant can still be compensated according to the duty period credit formula described above; the flight time formula operates only to supply additional compensation, above and beyond the compensation that would be owed under the duty period credit formula, for periods where flight time exceeds this 50 percent threshold.

As Oman observes, there are on-duty periods to which the flight time formula does not directly attribute compensation, such as preflight briefings. Oman contends that Delta's failure to specify a particular pay rate specific to these periods of time violates the obligation to pay at least minimum wage for all hours worked. And, according to Oman, any attempt to satisfy the minimum wage law by averaging the flight attendant's pay over the entire span of the duty period would violate the no-borrowing rule of *Armenta* and its progeny.

Oman's argument depends on a particular view of the role of the flight time formula under the parties' contract: That, by offering flight attendants a fixed amount of compensation for a particular rotation, but also disclosing the formula on which it has arrived at that amount, Delta has in effect promised to compensate flight attendants at their full flight pay rate for hours in flight, and not to compensate them at all for their other hours worked. But even if this were a plausible view of the flight time formula in isolation, it is not a plausible view of the formula as it operates in the broader context of the Work Rules. Under those rules, the flight time formula is just one of four components of a single compensation scheme that constitutes

Delta's contractual promise to its flight attendants. Flight attendants are presented with information about the entire scheme and bid on their work assignments according to the entire scheme. And the scheme, taken as a whole, does not promise any particular compensation for any particular hour of work; instead, as discussed above, it offers a guaranteed level of compensation for each *duty period* and each *rotation*. Because there are no on-duty hours for which Delta contractually guarantees certain pay—but from which compensation must be borrowed to cover other un- or undercompensated on-duty hours—the concerns presented by the compensation scheme in *Armenta, supra,* 135 Cal.App.4th 314 and like cases are absent here.

The same logic applies when either of Delta's remaining two formulas is used to calculate flight attendant compensation. In all cases, flight attendants are guaranteed at least the amount of compensation owed under the duty period credit formula, which, as already discussed, always exceeds the minimum wage. To forbid Delta from offering greater pay than the amount owed under that formula based on the flight time formula or one of the other two formulas would do nothing to ensure workers are paid fair or adequate wages for all hours worked. (See *Barrentine v. Arkansas-Best Freight System* (1981) 450 U.S. 728, 739 [minimum wage laws serve to ensure " ' "[a] fair day's pay for a fair day's work" ' "]; *Brooklyn Bank v. O'Neil* (1945) 324 U.S. 697, 706 [minimum wage protections serve "to protect certain groups of the population from sub-standard wages . . . due to . . . unequal bargaining power"].) There is no evident inadequacy or unfairness in permitting Delta to compensate flight crew members on a per-rotation basis, at a level no less than contractually promised and in excess of the

hourly minimum wage—nor is there any unfairness in permitting Delta to increase that compensation when, for example, duty periods include a greater percentage of flight time or rotations include more drawn-out off-duty layovers between duty periods.

Resisting this commonsense conclusion, Oman leans heavily on *Gonzalez, supra*, 215 Cal.App.4th 36, but *Gonzalez* will not support the weight. There, the employer auto dealership and service center compensated auto technicians on a piece-rate basis. Each repair task was assigned a set number of "flag hours" roughly corresponding to the length of time it ought to take to complete. The service center promised its technicians a flat rate tied to their experience level multiplied by the number of flag hours completed. Technicians also had significant wait time, during which no repair orders were pending and so no flag hours could be accrued, but during which the employer required them to remain on premises in case new customers arrived. The employer also calculated a " 'minimum wage floor,' " which equaled the total hours a technician remained on the premises multiplied by the applicable minimum wage. (*Id*. at p. 41.) If a technician's "flag hour" compensation fell below the minimum wage floor, the employer supplemented the technician's pay to make up for the difference. (*Id*. at pp. 41–42.) Employees sued for minimum wage violations based on the failure to pay for wait time.

The Court of Appeal concluded that the employer's compensation scheme violated California minimum wage law. It explained that the *Armenta* no-borrowing rule "applies whenever an employer and employee have agreed that certain work will be compensated at a rate that exceeds the minimum wage and other worktime will be compensated at a lower rate."

(*Gonzalez, supra,* 215 Cal.App.4th at p. 51.)   In such circumstances, pay at an agreed higher rate cannot be borrowed to make up for sub-minimum wage pay during other worktime. As the *Gonzalez* court read the parties' contract, the case before it involved such a situation:   The employer's contractual commitment to its workers was a guaranteed piece-rate for completing various repair tasks.  Having promised a particular amount of compensation for each flag hour, the employer could not borrow from that promised compensation to supply at least a minimum hourly wage for unpaid wait time hours without violating Labor Code section 223 and the *Armenta* no-borrowing rule.   The court illustrated with the hypothetical case of a worker promised $20 per flag hour who completed repair tasks assigned four flag hours but was then obligated to spend an additional four hours on site, during which no new orders came in.  In the *Gonzalez* court's view, paying the employee only $80 for this shift would either (1) violate the minimum wage, because the four hours of wait time were uncompensated, or (2) require the employee to forfeit half of his or her promised $20 per flag hour to cover the unpaid wait time, in violation of section 223. (*Gonzalez*, at p. 50.)  In other words, the additional wait time constituted periods not covered by the employer's commitment to piece-rate pay, but within the definition of hours worked, for which at least the minimum wage should have been paid.

This case is different from *Gonzalez* in critical respects.  In *Gonzalez*, the court understood the contract at issue to promise pay at a certain rate for certain tasks completed.  The minimum wage floor, which "supplement[ed]" employee pay only when "necessary," did not alter the nature of that promise. (*Gonzalez, supra,* 215 Cal.App.4th at p. 40.)  We do not address here, and

express no opinion concerning, a scenario in which a minimum wage floor was written into a contract that otherwise promised pay by the piece.[8] Because the employer in *Gonzalez* required technicians to remain at work while waiting for customers—time not accounted for by the piece-rate system—the Court of Appeal concluded the employer violated the no-borrowing rule by attempting to use piece-rate pay as a credit against its obligations to pay for wait time. By contrast, as we have explained, Delta's Work Rules reflect a promise to pay by the rotation, and for each rotation, the compensation Delta promises will, no matter which of the four formulas applies, always exceed the state minimum wage per hour worked. Thus, Delta satisfies state minimum wage law without ever needing to compromise its contractual commitments.

The minimum wage laws exist to ensure that workers receive adequate and fair pay, not to dictate to employers and employees what pay formulas they may, or may not, agree to adopt as a means to that end. (See *Madison Ave. Corp. v. Asselta*

---

[8] Since *Gonzalez*, this particular scenario has been addressed by the Legislature, which endorsed *Gonzalez*'s overarching principles and codified for piece-rate workers a statutory right to separate pay, at no less than the minimum wage, for otherwise uncompensated nonproductive and rest time. (Lab. Code, § 226.2, subd. (a), added by Stats. 2015, ch. 754, § 4; see Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1513 (2015–2016 Reg. Sess.) as amended Sept. 9, 2015, pp. 2 [bill "[c]odifies the *Gonzalez* and *Bluford* decisions that nonproductive time, rest breaks, and recovery breaks are separately compensated"], 3 [bill "[c]odifies that, for nonproductive time, the rate of compensation is not less than the minimum wage"].)

(1947) 331 U.S. 199, 203–204.) Delta's arrangement may be relatively unusual, but it is not unlawful.

## IV.

We answer the Ninth Circuit's questions as follows:

(1) Labor Code sections 204 and 226 do not apply to pay periods in which an employee works only episodically and for less than a day at a time in California unless the employee works primarily in this state during the pay period, or does not work primarily in any state but has his or her base of operations in California.

(2) State law limits on wage borrowing permit compensation schemes that promise to compensate all hours worked at a level at or above the minimum wage, even if particular components of those schemes fail to attribute to each and every compensable hour a specific amount equal to or greater than the minimum wage.

(3) In light of the answer to the question about the substantive application of the state's minimum wage laws, we do not address the separate question concerning the geographic scope of that law's application.

**KRUGER, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**GROBAN, J.**

OMAN v. DELTA AIR LINES, INC.

S248726

Concurring Opinion by Justice Liu

Today's opinion endorses the rule against wage borrowing established in *Armenta v. Osmose, Inc.* (2005) 135 Cal.App.4th 314 (*Armenta*) and reaffirmed in subsequent decisions. (Maj. opn., *ante*, at p. 19.) The court holds that an employer may not satisfy its obligation to pay at least the minimum wage for all hours worked by "borrowing compensation contractually owed for one set of hours or tasks to rectify compensation below the minimum wage for a second set of hours or tasks." (*Ibid*.) Delta Air Lines, Inc.'s (Delta) flight attendant compensation scheme does not violate this "no-borrowing" rule. (*Id*. at pp. 22–31.)

While agreeing with today's opinion, I write to highlight the first step in applying the no-borrowing rule: identifying the nature of the employer's contractual commitment to its employees. Because the rule requires employers to keep their contractual commitments in the course of fulfilling their minimum wage obligations, whether the rule is violated turns on what an employer's contractual commitments are. Courts should be careful not to allow employers to characterize their contractual commitments in ways that would effectively circumvent the no-borrowing rule.

Although *Armenta* established the no-borrowing rule in the context of a "minimum wage" claim, it is important to clarify that the rule's purpose is not to ensure that employees are paid, on average, hourly wages at or above a minimum threshold. In

no-borrowing cases, there is no dispute that the employees are paid at least the minimum wage when total compensation is averaged over all hours worked. The question is whether the employer is using contractually promised pay for certain tasks or hours worked to make up for failing to pay the minimum wage for other tasks or hours worked. As today's opinion explains, the purpose of the no-borrowing rule is to prevent employers from using clever accounting to effectively "reneg[e] on the employer's contractual commitments, in violation of the contract protection provisions of the Labor Code." (Maj. opn., *ante*, at p. 19.) Plaintiff flight attendants do not claim that their average pay ever fell below the minimum wage. Rather, they claim that the pay structure Delta promised did not compensate them for all the hours they worked.

Whether Delta or any other employer violates the no-borrowing rule thus turns on the nature of the pay structure the employer has promised. "The compensation owed employees is a matter determined primarily by contract." (Maj. opn., *ante*, at p. 19.) Employers may legally compensate their employees on any number of bases, including "by the standard of time, task, piece, commission basis, or other method of calculation." (Lab. Code, § 200, subd. (a); see Industrial Welfare Commission, wage order No. 9-2001, § 4(B) [compensation may be "measured by time, piece, commission, or otherwise"].) The unit of pay is often straightforward. In *Armenta*, the plaintiff employees "were paid hourly wages ranging between $9.08 to $20, depending on whether they were crew members or foremen." (*Armenta*, *supra*, 135 Cal.App.4th at p. 317.) In other cases, the compensation scheme may be more complex. Employers may use a combination of methods (e.g., *Bluford v. Safeway Inc.* (2013) 216 Cal.App.4th 864, 867 [truck drivers' compensation based on a

combination of miles driven and hours worked]) or alternative pay formulas that are triggered when certain conditions are met (e.g., *Vaquero v. Stoneledge Furniture, LLC* (2017) 9 Cal.App.5th 98, 103 (*Vaquero*) [compensation determined by the greater of sales commission or hourly minimum pay]; *Gonzalez v. Downtown LA Motors, LP* (2013) 215 Cal.App.4th 36, 41 (*Gonzalez*) [compensation determined by the greater of repair tasks completed or hourly minimum pay]).

Consistent with general contract interpretation principles, the employer's contractual commitment, including the unit of promised pay, is based on the objectively reasonable expectations of the parties at the time of contract. (See Civ. Code, § 1636 ["A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."].) Such principles include interpreting the employment agreement as a whole (*id.*, § 1641) and, if the contract language is ambiguous, looking to the context surrounding its formation (*id.*, § 1647) as well as the subsequent conduct of the parties (1 Witkin, Summary of Cal. Law (11th ed. 2017) Contracts, § 772).

Correctly identifying an employer's contractual commitment is critical to ensuring that employers do not circumvent the no-borrowing rule simply by inserting into employment agreements a minimum wage floor — i.e., an agreement to make up the difference if an employee's promised pay, averaged over all hours worked, falls below the applicable minimum wage. A minimum wage floor, by incorporating the concept of borrowing into the contract, would seem to be an easy way for an employer to inoculate itself against a no-borrowing claim.

Courts applying *Armenta* have rejected such compensation schemes. In *Vaquero*, a furniture store paid its salespeople on a commission basis and did not separately compensate them for legally mandated rest breaks. (*Vaquero, supra*, 9 Cal.App.5th at p. 103.) The employer also calculated employee pay based on the total number of hours an employee worked, including rest breaks. If a salesperson failed to earn more than an average of $12.01 per hour on commission, the employer made up the difference and subtracted that amount from the salesperson's earnings in the next pay period. (*Ibid.*) Construing the compensation scheme to promise payment by commission, the Court of Appeal concluded that the scheme failed to separately pay employees for rest breaks and therefore failed to pay for all hours worked. (*Ibid.*) The no-borrowing rule barred the employer from using pay promised for an employee's commission to fulfill its obligation to pay for rest breaks. (*Id.* at pp. 114–117.) The fact that the employer supplemented an employee's commission if it fell below a specified hourly floor did not cure the violation. (*Ibid.*)

Likewise, in *Gonzalez*, an automobile servicing company paid its mechanics for each repair they completed but did not compensate them for wait time between repairs. (*Gonzalez, supra*, 215 Cal.App.4th at p. 41.) The employer also calculated what it called a " 'minimum wage floor' " (*ibid.*): If a mechanic's compensation for repairs fell below what the mechanic would have made if paid the minimum wage for all hours worked, including wait time, the employer made up the difference. (*Id.* at pp. 41–42.) Despite such a minimum wage floor, the Court of Appeal affirmed the trial court's finding that the employer failed to pay for all hours worked. (*Id.* at p. 55.) The court found that the compensation system was a "piece-rate system" because the

"technicians [were] paid primarily on the basis of repair tasks completed." (*Id.* at p. 41.) It concluded that the no-borrowing rule developed in *Armenta* also applied to piece-rate compensation schemes. (*Id.* at p. 49.) Because the employer's piece-rate scheme did not separately compensate mechanics for wait time between repairs, the employer did not pay employees for all hours worked. Under the no-borrowing rule, the employer could not use pay promised for repair tasks to cover its obligations to pay for wait time. (*Id.* at p. 50; see also *Balasanyan v. Nordstrom, Inc.* (S.D.Cal. 2012) 913 F.Supp.2d 1001 [finding a violation of California wage law under *Armenta* where a department store paid salespeople on a commission basis and supplemented commissions if it fell below an average hourly minimum].)

Although *Vaquero* and *Gonzalez* did not extensively discuss the nature of each employer's respective contractual commitments, the reasoning of those decisions recognizes that employers cannot circumvent their obligation to pay employees for all hours worked or to pay the full amount of commissions, piece rates, or other compensation promised to employees simply by inserting a minimum wage floor into an employment agreement. A contrary conclusion would make it all too easy to evade the rule; a minimum wage floor would become a standard term in many employment contracts, and the rule would be emptied of real substance. The rule developed in *Armenta* is grounded in the protections of the Labor Code that prohibit an employer from diluting an employee's contractually promised wages. (*Armenta, supra,* 135 Cal.App.4th at p. 323 [discussing Lab. Code, §§ 221, 222, 223].) *Vaquero* and *Gonzalez* held that the employers in those cases made contractual commitments to commission and piece-rate pay, respectively, and the addition of

a minimum wage floor did not change those commitments. (Cf. *Cardenas v. McLane FoodServices, Inc.* (C.D.Cal. 2011) 796 F.Supp.2d 1246, 1252 [finding a violation of California wage law under *Armenta* even though the employer did not violate an "explicit agreement"].) Today's opinion leaves those decisions, and the protective force of the no-borrowing rule, intact.


**LIU, J.**


**I Concur:**
**CUÉLLAR, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Oman v. Delta Airlines, Inc.
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX on request pursuant to rule 8.548, Cal. Rules of Court
**Review Granted**
**Rehearing Granted**
_____

**Opinion No.** S248726
**Date Filed:**  June 29, 2020
_____

**Court:**
**County:**
**Judge:**
_____

**Counsel:**

Nichols Kaster, Matthew C. Helland, Daniel S. Brome; Altshuler Berzon, Michael Rubin and Barbara J. Chisholm for Plaintiffs and Appellants.

Carol Vigne, Katherine Fiester; Cynthia L. Rice; Olivier Schrieiber & Chao, Monique Olivier; Anna Kirsch; and Nayantara Mehta for California Employment Lawyers Association, California Rural Legal Assistance Foundation, Legal Aid at Work, National Employment Law Project and Women's Employment Rights Clinic as Amici Curiae on behalf of Plaintiffs and Appellants.

Mastagni Holstedt, David E. Mastagni and Isaac S. Stevens for Dan Goldthorpe, James Donovan, Chris Bennett, James Isherwood and David Vincent as Amici Curiae on behalf of Plaintiffs and Appellants.

Duckworth Peters Lebowitz Olivier, Monique Olivier and J. Erik Heath for California Employment Lawyers Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Morgan, Lewis & Bockius, Thomas M. Peterson, Robert Jon Hendricks and Andrew P. Frederick for Defendant and Respondent.

Ogletree, Deakins, Nash, Smoak & Stewart, Robert R. Roginson and Christopher W. Decker for Employers Group and California Employment Law Council as Amici Curiae on behalf of Defendant and Respondent.

Mayer Brown, Donald M. Falk, John P. Zaimes and Ruth Zadikany for Cathay Pacific Airways Limited as Amicus Curiae on behalf of Defendant and Respondent.

Greines, Martin, Stein & Richland, Robert A. Olson and Cynthia E. Tobisman for California New Car Dealers Association as Amicus Curiae on behalf of Defendant and Respondent.

Jones Day, Douglas W. Hall, Shay Dvoretzky and Vivek Suri for Airlines for America as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Matthew C. Helland
Nichols Kaster, LLP
235 Montgomery St., Suite 810
San Francisco, CA 94104
(415) 277-7235

Robert Jon Hendricks
Morgan, Lewis & Bockius LLP
One Market Street, Spear Tower
San Francisco, CA 94105
(415) 442-1000