Filed 7/2/21

OPINION AFTER TRANSFER FROM THE CALIFORNIA SUPREME COURT

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| CERTIFIED TIRE & SERVICE CENTERS WAGE & HOUR CASES | D072265<br><br><br>(JCCP No. 4762; San Diego Super. Ct. No. 37-2013-00038110-CU-OE-CTL; Riverside Super. Ct. No. RIC1307773) |

APPEAL from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.

Law Offices of Kevin T. Barnes, Kevin T. Barnes, Greg Lander; Righetti Glugoski, Matthew Righetti, John Glugoski, Michael C. Righetti; Scott Cole & Associates, Scott Cole, and Jeremy A. Graham for Plaintiffs and Appellants.

Carothers DiSante & Freudenberger, CDF Labor Law, Timothy M. Freudenberger, Robin E. Largent, and Garrett V. Jensen for Defendants and Respondents.

Kring & Chung, Kyle D. Kring and Kerri N. Polizzi for California Professional Association of Specialty Contractors as Amicus Curiae on behalf of Defendants and Respondents.

This is an appeal in a certified wage and hour class action following a judgment after a bench trial in favor of defendants Certified Tire and Service Centers, Inc. (Certified Tire) and Barrett Business Services, Inc. (collectively defendants). Plaintiffs contend that Certified Tire violated the applicable minimum wage and rest period requirements by implementing a compensation program, which guaranteed its automotive technicians a specific hourly wage above the minimum wage for all hours worked during each pay period but also gave them the possibility of earning a higher hourly wage for all hours worked during each pay period based on certain productivity measures.

We previously issued an opinion in this appeal on September 18, 2018, in which we affirmed the judgment. (*Certified Tire & Service Centers Wage & Hour Cases* (2018) 28 Cal.App.5th 1, review granted Jan. 16, 2019, S252517 (*Certified Tire*).) Our Supreme Court granted review in January 2019, deferring consideration and disposition until it decided a related issue in *Oman v. Delta Air Lines, Inc.* (2020) 9 Cal.5th 762 (*Oman*)). In September 2020, our Supreme Court transferred this matter to us with directions to vacate our September 18, 2018 opinion and to reconsider this appeal in light of *Oman*. We directed the parties to submit supplemental briefing regarding *Oman* and any other matter arising after our original decision, and we held oral argument.

As we will explain, after considering the parties' supplemental briefing on the applicability of *Oman* to the issues presented in this matter, we

2

conclude that that plaintiffs' appeal lacks merit, and we accordingly affirm the judgment.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

A.      *Certified Tire's Compensation Program for Automotive Technicians*

During the time period at issue in this appeal, Certified Tire was a business that sold tires and performed automotive repairs for the general public through its 40 stores in California.  Certified Tire employed automotive technicians to diagnose and repair customer vehicles.

Throughout the relevant timeframe, technicians at Certified Tire were compensated through the Technician Compensation Program (the TCP). Under the TCP, a technician was paid an hourly wage for all work performed, but the hourly rate earned by a technician varied from pay period to pay period.  A technician's hourly rate for the applicable pay period was guaranteed to be *at least* an agreed-upon minimum hourly rate that the technician was assigned at the time of hire, which in all cases *exceeded* the legal minimum wage.[1]  Under the TCP, the hourly rate paid to a technician

---

[1]      At trial in 2016, Certified Tire's president testified that at the beginning of the class period in 2009, the lowest guaranteed minimum hourly rate assigned to a technician upon hiring was $10 per hour in Southern California and then $11 per hour in Northern California when the company expanded to that area in 2010.  The lowest guaranteed minimum hourly rate was raised as of January 2016 to $11 per hour and $12 per hour, respectively. Only a fraction of the technicians were assigned the *lowest* guaranteed minimum hourly rate.  Depending on experience and qualifications, technicians were assigned guaranteed minimum hourly rates as high as $18 per hour.  At the beginning of the class period in 2009, the California minimum wage was $8 per hour, which was increased to $9 per hour on July 1, 2014, and to $10 per hour as of January 1, 2016.  (Lab. Code, former § 1182.12, as amended by Stats. 2006, ch. 230, § 1 and Stats. 2013, ch. 351,

3

during any given pay period could be higher than the guaranteed minimum hourly rate based on a formula that rewarded the technician for work that was billed to the customer by Certified Tire as a separate labor charge.

Under the formula, each billed dollar of labor charged to a customer as a result of the technician's work during the pay period was referred to as the technician's "production dollars."[2] Certified Tire applied the formula by multiplying the technician's production dollars by 95 percent, multiplying that amount by a fixed "tech rate" assigned to the technician depending on experience and qualifications,[3] and then dividing by the total hours worked

§ 1.)  Therefore, at the time of trial, the guaranteed minimum hourly rate promised to technicians by Certified Tire during the class period not only *met*, but *exceeded,* the applicable California minimum wage at all times.  It is accordingly clear that the guaranteed minimum hourly rate in Certified Tire's compensation system did not function as a *minimum wage* floor.  Instead, each employee was assigned an hourly wage floor, which was always *in excess of* the California minimum wage and as high as $18 per hour.  (Cf. *Oman*, *supra*, 9 Cal.5th at p. 788 [expressing no opinion concerning "a scenario in which a minimum wage floor was written into a contract that otherwise promised pay by the piece"].)

[2]  Certain tasks performed by a technician were billed at a predetermined labor cost to the customer.  For example, a document associated with one technician from 2013 shows that a brake fluid exchange was billed to the customer at a predetermined labor cost of $47, and a transmission fluid exchange was billed to the customer at a predetermined labor cost of $58.  In addition, a variety of tasks performed by technicians were not assigned a predetermined labor cost, but the customer was billed at a specific hourly labor rate based on the labor time expected to complete the task.  A technician's production dollars were based on all of the labor charges billed to a customer for the technician's services during the pay period.

[3]  The "tech rate" assigned to a technician at the time of hire generally ranges from 28 percent to 34 percent, and a technician may increase his or her "tech rate" in the course of employment by pursuing specific certifications or testing to increase his or her qualifications as a mechanic.

4

by the technician during the pay period.  By applying this formula, Certified Tire determined the technician's "base hourly rate" for the pay period.  If the base hourly rate exceeded the technician's guaranteed minimum hourly rate, the technician was paid the base hourly rate for all time worked during the pay period.  If the guaranteed minimum hourly rate was higher than the base hourly rate, the technician was paid the guaranteed minimum hourly rate for all time worked during the pay period.[4]  Overtime hours were paid at one

[4]    The dissent cannot understand why, under the TCP, after figuring the technician's production dollars, times 95 percent, times the "tech rate," Certified Tire then *divided* by the total number of hours worked during the pay period to calculate the "base hourly rate," and finally *multiplied* the base hourly rate by the total number of hours worked during the pay period.  The dissent contends that the multiplication and division cancel each other out, and therefore must amount to "pure sophistry."  The dissent is "convinced" that the "unnecessary complexity of the TCP formula" is "nothing more than a disguise designed to mask a violation of California's minimum wage law." The dissent's suspicions are unfounded because there is good reason under the TCP for Certified Tire to divide by the total number of hours worked (in calculating the base hourly rate) and then multiply by that same number in calculating the technician's pay for the period.  Specifically, a technician was entitled to be paid the *greater* of (1) the base hourly rate *or* (2) the technician's guaranteed minimum hourly rate.  Certified Tire *divided* the production dollars by the total number of hours worked to arrive at the base hourly rate in order to determine whether, for that pay period, the base hourly rate was *greater* than the guaranteed minimum hourly rate.  After the greater hourly rate was determined, that hourly rate (whether the guaranteed minimum hourly rate or the base hourly rate) was multiplied by the total number of hours the technician worked in the pay period to arrive at the technician's pay.  The dissent is able to characterize the TCP's calculations as unnecessarily complicated only because the dissent ignores the central role that the guaranteed minimum hourly rate played in Certified Tire's compensation system.

and a half times the hourly rate that applied during the pay period.[5]

Technicians at Certified Tire were required to be clocked in during all work hours, except for their lunch period, and they were paid at an hourly rate for all hours on the clock. The hours during which technicians were clocked in at work were reflected in timekeeping reports. Technicians took rest breaks as required by law, and they did not clock out while doing so.

Certified Tire's president testified that he designed the TCP to incentivize technicians "to hustle" to get things done, and to make Certified Tire a more competitive employer in the industry by allowing technicians to significantly increase their hourly compensation based on their efficiency without any cap on the amount of compensation. According to Certified Tire's president, some technicians achieved a base hourly rate of up to $70 per hour during a pay period.

Some work activities that the technicians were required to perform did not directly generate production dollars, as those activities were not associated with labor costs charged to a customer. These activities include certain automotive services, including some oil changes and some tire rotations, as well as time spent cleaning or attending meetings.

Because the total production dollars brought in during a pay period were *divided by* the total hours worked during a pay period, a technician would receive *less* of an increase over his or her guaranteed minimum hourly rate either when he or she was an inefficient worker who spent too much

---

[5] For example, a technician with a "tech rate" of 30 percent who generated $5,000 of production dollars in an 80-hour pay period, would achieve a base hourly rate for that pay period of $17.81 (based on $5,000 multiplied by .95, multiplied by .30, divided by 80). Assuming that base hourly rate was higher than the technician's guaranteed minimum hourly rate, the technician would be paid $17.81 multiplied by 80 hours for the pay period, for a total payment of $1,424.80.

time performing particular tasks or when he or she performed tasks that did not bring in production dollars. A technician also could not accumulate production dollars during a rest break. However, all of a technician's tasks and each rest period taken by a technician were always compensated because technicians got paid an hourly rate for all of the time that they were clocked in at work.

B.    *The Lawsuit*

The instant appeal is based on multiple wage and hour class action lawsuits filed against Certified Tire and Barrett Business Services, Inc.[6] in the superior court in Riverside County and San Diego County by plaintiffs Oscar Gutierrez, Pascal Jeandebien, and Michael Rehse. After the lawsuits were coordinated in San Diego County Superior Court,[7] a first amended coordinated complaint was filed.[8] On December 22, 2015, the trial court certified the class action with respect to several defined classes, two of which

---

[6]    According to the evidence at trial, Barrett Business Services, Inc. was the payroll company that Certified Tire employed during some of the class period. No argument was presented at trial concerning the alleged liability of Barrett Business Services, Inc.

[7]    The order granting the petition to coordinate was not included in the Appellants' Appendix. In response to an argument raised in the respondents' brief, plaintiffs have requested that we take judicial notice of an order granting the petition to coordinate dated November 7, 2013. We hereby grant the unopposed request to take judicial notice.

[8]    Among other things, the first amended coordinated complaint alleged causes of action under (1) the Private Attorneys General Act of 2004, Labor Code section 2699, subdivision (a), which provides that a civil penalty assessed by statute for a violation of the Labor Code may be recovered in a civil action brought by aggrieved employees; and (2) Business and Professions Code sections 17200 through 17208, alleging unlawful and fraudulent business practices based on violations of Labor Code provisions.

are relevant here: (1) "All [t]echnicians employed by Defendant from March 6, 2009, to the present to whom Defendant failed to pay a separate minimum wage for non-productive time"; and (2) "All [t]echnicians employed by Defendant from March 6, 2009, to the present to whom Defendant failed to pay for off duty rest periods." The trial court also found that Gutierrez, Jeandebien, and Rehse (plaintiffs) would adequately represent the class.

The trial court conducted a bench trial in December 2016. In their joint trial readiness conference report, the parties agreed that "[t]he only issue for resolution in Phase I is the legality of [the TCP]. Any other liability and injunctive/damages issues, if necessary, are deferred until after a ruling on Phase I." The parties identified the issue to be determined by the trial court as: "Have Plaintiffs met their burden to show that Certified Tire's [TCP] violates California law?"

The parties also entered into stipulations concerning the applicable legal standards. Specifically, the parties stipulated that Certified Tire was "governed by the California Labor Code and Wage Order 4[-2001]" (Wage Order 4). (Cal. Code Regs., tit. 8, § 11040.)[9] The parties agreed that under Wage Order 4, "Every employer shall pay to each employee, on the established payday for the period involved, not less than the applicable minimum wage for all hours worked in the payroll period, whether the

_____

[9]      In California, "wage and hour claims are today governed by two complementary and occasionally overlapping sources of authority: the provisions of the Labor Code, enacted by the Legislature, and a series of 18 wage orders, adopted by the [Industrial Welfare Commission (IWC)]." (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1026.) Here, the parties agree that Wage Order 4 applies, as it pertains to "all persons employed in professional, technical, clerical, mechanical, and similar occupations . . . ." (Cal. Code Regs., tit. 8, § 11040, subd. 1.) "[M]echanics" are included by definition under the scope of persons employed in those occupations. (*Id.*, subd. 2(O).)

8

remuneration is measured by time, piece, commission, or otherwise." (Cal. Code Regs., tit. 8, § 11040, subd. 4(B).) The parties identified the applicable minimum wage as "not less than nine dollars ($9.00) per hour for all hours worked, effective July 1, 2014, and not less than ten dollars ($10.00) per hour for all hours worked, effective January 1, 2016." In addition, the parties agreed that Wage Order 4 provides for rest periods as follows: "Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof. . . . Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages." (Cal. Code Regs., tit. 8, § 11040, subd. 12(A).)

The trial court held a bench trial at which several witnesses testified, including the plaintiffs, other former or current technicians at Certified Tire, supervisors from Certified Tire, a Certified Tire employee in charge of payroll, and Certified Tire's president. The evidence regarding the details of the TCP was largely undisputed, and it was also undisputed that technicians at Certified Tire were required to clock in for all hours while at work, and they took their required rest breaks while clocked in during the workday.

Plaintiffs' counsel argued in closing that Certified Tire was not in compliance with the minimum wage and rest period requirements set forth in Wage Order 4. For this argument, plaintiffs relied on case law that prohibits averaging the amount an employee receives during a pay period for nonpaid and paid work hours to comply with the minimum wage requirements. (See, e.g., *Armenta v. Osmose, Inc.* (2005) 135 Cal.App.4th 314 (*Armenta*).) According to plaintiffs' counsel, by using the TCP to compensate technicians,

9

Certified Tire was "secretly paying the lower wage—nothing for those non-billed hours—while purporting, making it look like through their averaging, that they're paying at least minimum wage for the non-billed time when, in fact, they're paying nothing for the non-billed time." Plaintiffs' counsel argued that under the TCP, "[n]ot a penny hits their pocket when they do an oil change, when they attend a meeting, when they do any cleaning." As similarly argued in plaintiffs' trial brief filed at the close of the bench trial, "Technicians earn *no wages* for time spent on tasks that do not generate labor dollars for [Certified Tire] (i.e., oil changes, tire rotations, cleaning, meetings, Preventative Maintenance Analysis (PMA), running errands and waiting for customer cars to work on) since those tasks do not add to 'Production Dollars' under [Certified Tire's] formula." (Italics added, underscoring omitted.) Referring to the fact that rest breaks did not generate labor charged to the customer that fed into the technician's base hourly rate, plaintiffs' counsel also argued that Certified Tire was in violation of the rest period requirement in Wage Order 4. Counsel argued, "I think it's undisputed here that when technicians are on a rest break, they cannot add to their wages during those rest breaks. The wages stay the same." According to plaintiffs, "When [t]echnicians are paid as a percentage of Production Dollars they receive no separate wages for . . . statutorily mandated rest breaks." (Underscoring omitted.)

The trial court issued a statement of decision in favor of Certified Tire. After extensively setting forth the testimony and evidence presented at trial and the governing case law, the trial court explained that plaintiffs had not established any violation of the wage and hour laws. The trial court stated,

> "First, the parties agree that this is not an 'off-the-clock' case. [Certified Tire's] 'Technician's Timekeeping Reports'

10

accurately reflect the times and hours worked by that [t]echnician during the corresponding time period. . . .

"Second, contrary to the Court's concern in *Armenta*, [Certified Tire] has not 'averaged' the technicians' hours to calculate their wages; instead, [Certified Tire] applies the higher base rate, if any, to all of the hours worked—billed and non-billed labor—by the technicians. The Court recognizes that the technicians' production may vary from one day to the next throughout the two[-]week pay period which, as calculated at the end of two weeks, may be different than a snapshot of the technicians' production on any given day. However, it appears to the Court that, to the extent the technicians are entitled to be paid a higher base rate, the averaging, if any, only adds to (as opposed to subtracts from) the technicians' wages. Ultimately, the calculation of the technicians' wages, under this formula, is much more about the technicians' wage 'ceiling' rather than wage 'floor.'

"Third, the Court finds that, based on this record, the technicians have been paid, at all times, a guaranteed minimum wage for all of their hours worked—billed and non-billed labor. In other words, even during pay periods where the technicians have been wholly unproductive, they have been paid minimum wages which comply with the California wage and hour laws at issue in this case."

The trial court entered judgment in favor of Certified Tire on April 12, 2017. On May 9, 2017, a notice of appeal was filed.[10] We previously issued

---

[10] The notice of appeal form, as completed by class counsel and filed on May 9, 2017, stated that plaintiff Gutierrez was the party filing the appeal and did not mention the other two plaintiffs. However, as early as the filing of the motion for relief from default in this court on June 27, 2017, and the filing of the Civil Case Information Statement in this court on July 7, 2017, the court filings by plaintiffs have identified all three plaintiffs as the appealing parties. Consistently, the opening appellate brief states that it is filed on behalf of all three plaintiffs. Accordingly, the omission of the names of the other two plaintiffs in the notice of appeal appears to have been an

an opinion affirming the judgment. (*Certified Tire*, *supra*, 28 Cal.App.5th 1, review granted.) The Supreme Court granted review and later transferred this matter to us with directions to vacate our September 18, 2018 opinion and to reconsider in light of *Oman*, *supra*, 9 Cal.5th 762. We hereby vacate our September 18, 2018 opinion and proceed to reconsider plaintiffs' appeal.

II.

DISCUSSION

A. *Standard of Review*

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo. [Citation.] We apply a substantial evidence standard of review to the trial court's findings of fact." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) When the facts are undisputed, "[a] reviewing court determines the meaning of a wage order de novo." (*Gonzalez v. Downtown LA Motors, LP* (2013) 215 Cal.App.4th 36, 44 (*Gonzalez*).)

Here, plaintiffs state that the evidence is undisputed concerning the details and application of the TCP. However, they contend that the trial

---

oversight or a typographical error. In a footnote, the respondents' brief seizes on the content of the notice of appeal and points out that it identified only Gutierrez as the appealing party. Defendants contend that, accordingly, "Plaintiff Gutierrez is the only Appellant, and any appeal rights on behalf of any other plaintiff or class member have been waived." We disagree, as this case is a certified class action lawsuit. As a result of the order certifying this case as a class action, Gutierrez, along with the two other plaintiffs, are each participating in this litigation in their capacity as class representatives. Accordingly, because of Gutierrez's status as a class representative in a certified class action lawsuit, his notice of appeal served as an appeal on behalf of the entire class, including the other two plaintiffs who fall within the scope of the class. Further, defendants have identified no manner in which they have been prejudiced by omission of the other two plaintiffs from the notice of appeal.

court erred in concluding, based on those undisputed facts, that the TCP does not violate the requirement that Certified Tire pay the minimum wage and provide paid rest periods as set forth in Wage Order 4. Accordingly, we apply a de novo standard of review to the legal questions presented here.

B. *Applicable Case Law Regarding Plaintiffs' Minimum Wage and Rest Period Argument*

At the time of our prior opinion in this appeal, the question of whether the TCP complied with the requirement to pay minimum wage for all periods worked was governed by *Armenta, supra,* 135 Cal.App.4th 314, and the case law subsequently applying its holding to various situations. (See, e.g. *Gonzalez, supra,* 215 Cal.App.4th at p. 49 [a specific piece-rate compensation plan applied to auto technicians did not comply with minimum wage requirements]; *Vaquero v. Stoneledge Furniture LLC* (2017) 9 Cal.App.5th 98, 110-111 (*Vaquero*) [a specific commission-based compensation plan for employees of a furniture store did not comply with requirement to pay minimum wage for rest periods]; *Bluford v. Safeway Stores, Inc.* (2013) 216 Cal.App.4th 864, 872 [a specific piece-rate compensation plan applied to truck drivers based on miles driven did not comply with requirement to pay minimum wage for rest periods].)[11] *Armenta* held that under California's minimum wage law, workers who maintained utility poles in the field were entitled to be paid their promised hourly wage for time spent on productive

---

[11] We note that effective January 1, 2016, the Legislature enacted Labor Code, section 226.2, which codified the holdings of *Gonzalez* and *Bluford*, providing for separate payment for nonproductive work time and for rest periods when employees are compensated on a piece-rate basis. (Stats. 2015, ch. 754, § 4; see *Nisei Farmers League v. Labor & Workforce Development Agency* (2019) 30 Cal.App.5th 997, 1006-1007 [describing Lab. Code, § 226.2].) The parties do not contend that section 226.2 is applicable here, and we therefore do not address it.

tasks in the field, but were *also* entitled to an additional payment of at least minimum wage for hours spent on nonproductive tasks that the employer did not promise to compensate, such as driving to the job site, loading equipment, or processing paper work. (*Armenta,* at pp. 317, 324.) As a basis for this holding, *Armenta* explained that the applicable provisions of the Labor Code "articulate the princip[le] that all hours must be paid at the statutory or agreed rate and no part of this rate may be used as a credit against a minimum wage obligation." (*Id.* at p. 323, citing Lab. Code, §§ 221, 222, 223.)

In *Oman*, *supra*, 9 Cal.5th 762, our Supreme Court addressed *Armenta* and subsequent case law for the first time, concluding that it agreed with the general rule expressed in those opinions. As *Oman* explained, "[T]he unanimous Courts of Appeal . . . have embraced a[n] . . . understanding of state law that forbids taking compensation contractually due for one set of hours and spreading it over other, otherwise un- or undercompensated, hours to satisfy the minimum wage," which *Oman* referred to as " 'wage borrowing.' " (*Id.* at p. 779.) *Oman* concluded, "Although we have not previously had occasion to address the issue, we agree with this consensus: State law prohibits borrowing compensation contractually owed for one set of hours or tasks to rectify compensation below the minimum wage for a second set of hours or tasks, regardless of whether the average of paid and unpaid (or underpaid) time exceeds the minimum wage. Even if that practice nominally might be thought to satisfy the requirement to pay at least minimum wage for each hour worked, it does so only at the expense of

14

reneging on the employer's contractual commitments, in violation of the contract protection provisions of the Labor Code." (*Oman*, at p. 781.)[12]

In agreeing with the general approach set forth in prior case law, *Oman* emphasized that the rule against wage borrowing is based on the principle that "[t]he compensation owed employees is a matter determined primarily *by contract*." (*Oman*, *supra*, 9 Cal.5th at p. 781, italics added.) As *Oman* explained, "California law . . . expressly protects employees' right to receive the wages promised in a contract or collective bargaining agreement." (*Id*. at p. 780, citing Lab. Code, §§ 221, 222, 223.) "Wage borrowing would violate these statutes by reducing compensation, for the hours from which wages were borrowed, below the contractually agreed-upon level." (*Oman*, at p. 780.) However, "the relevant provisions of the Labor Code prohibit borrowing *only when* it results in failure to maintain the wage scale designated by contract." (*Id*. at p. 783, italics added.)

Focusing on the contractual nature of compensation, *Oman* stated, "Compensation may be calculated on a variety of bases: Although nonexempt employee pay is often by the hour, state law expressly authorizes employers to calculate compensation by the task or piece, by the sale, or by any other convenient standard. . . . Consistent with general contract interpretation principles, the unit for which pay is promised should be determined based on

---

[12]    *Oman* concerned a compensation system applicable to airline flight attendants, under which compensation was based on certain formulas applied to each "rotation" worked by the flight attendants. (*Oman, supra,* 9 Cal.5th at pp. 783-784.) In reconsidering this appeal in light of *Oman*, we proceed by applying the specific legal principles announced in *Oman* rather than by comparing the details of Certified Tire's TCP to the compensation system at issue in *Oman.* Because of the significant differences in the systems, a comparison between the two systems would not be helpful to our analysis.

the 'mutual intention of the parties as it existed at the time of contracting.' (Civ. Code, § 1636.) [¶] Whatever the task or period promised as a basis for compensation, however, an employer must pay no less than the minimum wage for all hours worked. . . . The employer must satisfy this obligation while still keeping any promises it has made to provide particular amounts of compensation for particular tasks or periods of work. . . . For all hours worked, employees are entitled to the greater of the (1) amount guaranteed by contract for the specified task or period, or (2) the amount guaranteed by the minimum wage. Whether a particular compensation scheme complies with these obligations may be thought of as involving two separate inquiries. First, for each task or period covered by the contract, is the employee paid at or above the minimum wage? Second, are there other tasks or periods not covered by the contract, but within the definition of hours worked, for which at least the minimum wage should have been paid?" (*Oman*, *supra*, 9 Cal.5th at pp. 781-782, citations omitted.)

In short, *Oman* clarifies that an employer upholds its legal obligation to pay the minimum wage for each hour worked when it pays its employees according to its contractual promise, and it pays at least the statutory minimum wage for each hour worked. Impermissible wage borrowing occurs only when an employer takes away some of an employee's contractually promised compensation to cover periods or tasks that are required of the employee but are not compensated at all or are compensated at a rate below the minimum wage.

C.  *Based on Certified Tire's Contractual Commitment to the Technicians, It Did Not Engage in Wage Borrowing*

Plaintiffs contend that Certified Tire's TCP violated California's minimum wage and rest period requirements because it engaged in the prohibited practice of wage borrowing as described in *Oman*. As *Oman*

16

observed, "[b]ecause the relevant provisions of the Labor Code prohibit borrowing only when it results in failure to maintain the wage scale designated by contract, the resolution necessarily turns on the nature of [the employer's] contractual commitments." (*Oman, supra*, 9 Cal.5th at p. 783.) We therefore begin by focusing on the relevant terms that define Certified Tire's contractual commitment to its technicians regarding their wages.

The first step in defining Certified Tire's contractual commitment is to determine "the unit for which pay is promised." (*Oman, supra*, 9 Cal.5th at p. 782.) Here, Certified Tire unambiguously promised to pay *by the hour*. Specifically, each technician was promised an hourly wage for all time on the clock, including rest periods. The hourly wage was always *at least* a guaranteed minimum hourly rate that was negotiated with the technician at the time of hire. That hourly rate always *exceeded* the California minimum wage, and for some technicians was as much as $18 per hour. A technician could then *increase* the applicable hourly rate for the pay period to a rate above that technician's guaranteed minimum hourly rate. Whether the technician would receive an *increased* hourly rate depended on a calculation at the end of the pay period based on a percentage of how many production dollars were associated with the technician's work during that period. At all times, however, the unit for which pay was promised was *by the hour*.[13]

For the purposes of their argument, plaintiffs attempt to separate Certified Tire's compensation system into two different programs: one in

---

[13] The dissent contends that, although nominally an hourly-based compensation system, Certified Tire's compensation system should be treated as a *commission-based system* under which an employee was compensated based on the production dollars associated with his or her work during the pay period. According to the dissent, "Certified Tire's TCP is functionally a commission compensation scheme in which the employee works both

17

which a technician could be paid *by the hour* according to his or her guaranteed minimum hourly rate, and a second in which a technician could be compensated based on a percentage of the production dollars he or she produced during the pay period.  We reject this characterization as it is contrary to the plain terms of Certified Tire's compensation system.  At all times, technicians were compensated *by the hour*.  The production dollars produced by a technician during the pay period were relevant only because they determined whether the technician had contributed enough value to the

---

productive and nonproductive hours, yet is not separately compensated for the latter." We disagree.  Yes, Certified Tire's compensation system indisputably contained some of the *characteristics* of a commission-based system.  Specifically, a technician's productivity (measured by production dollars) was used to determine whether the technician was entitled to an *increased* hourly rate for the pay period.  However, the fundamental "unit for which pay is promised" (*Oman, supra,* 9 Cal.5th at p. 782) was compensation *by the hour*, premised on either the greater of the guaranteed minimum hourly rate or the increased (productivity-based) hourly rate.  Thus, contrary to the dissent's suggestion, this case simply does not present the question of how a pure commission-based compensation system would fare under the legal analysis set forth in *Oman*.

Citing *Vaquero, supra,* 9 Cal.App.5th 98, the dissent purports to identify basic rules as to how the prohibition against wage borrowing applies to commission-based compensation systems.  According to the dissent, "when an employer elects to pay employees by commission—that is, a percentage of sales generated by the employee—it must 'separately compensate' them by paying at least minimum wage for nonproductive time (including rest breaks) that cannot generate compensable sales."  We note, however, that the flight attendant compensation system at issue in *Oman* was not a commission-based system, and *Oman* accordingly did not address the finer details of how the no-borrowing principle it endorsed should apply in a commission-based context.  Although future case law will illuminate how *Oman* applies in the context of commission-based systems, the instant litigation does not present an opportunity for the development of that issue, as Certified Tire's compensation system was fundamentally an *hourly-based* system.

18

company over the course of the pay period to justify an increased *hourly* rate.[14]

Plaintiffs also contend that technicians were not paid on an hourly basis because they were not paid a "set hourly rate" that stayed the same from pay period to pay period. That contention also fails. Even though technicians had the opportunity to earn an *increased* hourly rate based on their productivity during each pay period, the technicians were indisputably paid according to *an hourly rate* for all time on the clock. The fact that the hourly rate could fluctuate between pay periods based on a technician's productivity did not alter the nature of Certified Tire's promise to pay *by the hour*.

As *Oman* directs, after having determined the unit for which pay was promised, the next step in evaluating whether wage borrowing has occurred is to answer two questions: "First, for each task or period covered by the contract, is the employee paid at or above the minimum wage? Second, are there other tasks or periods not covered by the contract, but within the definition of hours worked, for which at least the minimum wage should have been paid?" (*Oman*, *supra*, 9 Cal.5th at p. 782.) Here, because Certified Tire paid its technicians by the hour, the answer to these questions is straightforward.

As to the first question, technicians were paid "at or above the minimum wage" for "each task or period covered by the contract." (*Oman*, *supra*, 9 Cal.5th at p. 782.) Specifically, because Certified Tire paid

---

14    Moreover, any attempt by plaintiffs to claim that Certified Tire had two different compensation programs is contradicted by the admission in their appellate reply brief filed in 2018, where they acknowledged that "[i]t is undisputed that [Certified Tire] utilized a *single* compensation plan – the TCP."

technicians by the hour based on the amount of time they were clocked into work each pay period, the "task or period covered by the contract" (*ibid*.) was the *total hours* that the technician worked during each pay period. It is undisputed that each technician was paid "at or above the minimum wage" (*ibid*.) for that period because each technician's guaranteed minimum hourly rate not only met, but in all cases *exceeded*, the California minimum wage.

As to the second question, under Certified Tire's compensation system there were no "other tasks or periods not covered by the contract, but within the definition of hours worked, for which at least the minimum wage should have been paid." (*Oman*, *supra*, 9 Cal.5th at p. 782.) By receiving an hourly wage for all hours they were at work, the technicians necessarily received compensation at a rate above minimum wage for all "tasks or periods . . . within the definition of hours worked." (*Ibid*.) Under this scenario, there was no opportunity for Certified Tire to *borrow* from promised wages to cover uncompensated or undercompensated work because the technicians did not experience any uncompensated or undercompensated tasks or periods. They were paid at an hourly rate for every single hour they were clocked in at work.

Plaintiffs contend that the wage borrowing inquiry endorsed by *Oman* leads to the opposite conclusion, namely that Certified Tire's compensation system involves improper wage borrowing. Plaintiffs' argument depends on a specific characterization of the compensation contract between Certified Tire and its technicians. Plaintiffs focus on what they refer to as "Billed Labor tasks," defined as the tasks that a technician performs to earn production dollars. According to plaintiffs, "[a] Certified Tire [t]echnician earns compensation by performing Billed Labor tasks. . . . Certified Tire is contractually obligated to compensate those employees for the work

performed. In other words, Certified Tire has a contractual obligation to pay [t]echnicians who perform Billed Labor tasks the compensation associated with those tasks." (Emphasis omitted.) Plaintiffs explain that technicians "are contractually entitled to compensation promised for completing Billed Labor tasks — 'without diminution.' "

Based on this premise, plaintiffs contend that Certified Tire engages in wage borrowing because "[t]echnicians have uncompensated hours . . . when they perform Non-Billed Labor tasks," that is, tasks which do not generate production dollars, or when they take rest breaks. Plaintiffs reason as follows: "Pursuant to the TCP, Certified Tire has a contractual obligation to compensate [t]echnicians when they complete Billed Labor tasks. Certified Tire, however, impermissibly borrows from the [t]echnicians' promised compensation (for completing Billed Labor tasks) and applies that earned compensation to those periods of time in which [t]echnicians receive no compensation (because they are performing Non-Billed Labor tasks or taking rest break[s]). By borrowing against the compensation owed to [t]echnicians in order to pay for time where nothing is earned or paid, Certified Tire's compensation scheme violates *Oman*'s no borrowing principle and fails to comply with California minimum wage requirements."

There are two fundamental problems with plaintiffs' argument. First, plaintiffs assert that under Certified Tire's compensation system, when a technician performed Billed Labor tasks, the technician earned "the compensation associated with those tasks," which Certified Tire was contractually obligated to pay " 'without diminution.' " This description of the compensation system is flawed because Certified Tire did not promise any *specific compensation* when a technician completed a task that earned production dollars. Technicians were not paid by the task; they were paid by

21

the hour. The completion of a particular task had value because the production dollars associated with that task were fed into a formula at the end of the pay period to determine whether the technician would receive a base hourly rate above his or her guaranteed minimum hourly rate. Certified Tire did *not* promise that a technician would receive any specific compensation based on the completion of any particular task. It promised *only* that tasks that earned production dollars would give technicians a *chance* to increase their base hourly rate at the end of the pay period, but the *specific amount* of that increase could not be determined at the time the task was performed. Because Certified Tire did not promise to pay any specific compensation when a technician performed a particular task, it follows that Certified Tire could not have *borrowed* from that specific compensation to meet its minimum wage obligations for other purportedly uncompensated tasks.

Second, plaintiffs contend that "[t]echnicians have *uncompensated* hours . . . when they perform Non-Billed Labor tasks," which are compensated by borrowing from the compensation for Billed Labor tasks. (Italics added.) To illustrate that "uncompensated" hours exist, plaintiffs ask us to compare the wages that would be earned by two hypothetical technicians at Certified Tire. In an attempt to explain plaintiffs' point, we turn to the following scenario: assume one technician generated $2,000 of production dollars in a 30-hour pay period working solely on tasks that generated production dollars. A second technician generated $2,000 of production dollars in a 40-hour pay period, devoting 10 hours of the 40 hours to tasks that did not generate production dollars. Further assume both technicians had a "tech rate" of 30 percent. The base hourly rate for the first technician is $19 per hour ($2,000 x .95 x .30 ÷ 30 = $19). The base hourly

rate for the second technician is $14.25 per hour ($2,000 x .95 x .30 ÷ 40 = $14.25). For 30 hours of work the first technician got paid $570 during the pay period ($19 x 30 = $570). For 40 hours of work the second technician also got paid $570 during the pay period ($14.25 x 40 = $570).[15] According to plaintiffs, a hypothetical such as this illustrates that because both technicians took home the same amount in their paychecks (i.e., $570) even though the second technician worked 10 hours more than the first technician while involved in tasks that did not generate production dollars, the second technician was *uncompensated* for the last 10 hours of the pay period. As we will explain, we disagree.

It is true that a technician's base hourly rate would end up being *less* at the end of a pay period when the technician devoted a higher percentage of time to tasks that *did not* generate production dollars, as opposed to tasks that *did* generate production dollars. However, a technician who performed tasks that did not generate production dollars did not work any hours that were *uncompensated*. In the scenario set forth above, the second technician was paid at an hourly rate that exceeded the minimum wage for *all* hours worked regardless of the type of work involved. Specifically, the technician was paid at an hourly rate of $14.25 for all tasks performed during the pay period. The technician also received paid rest breaks at the rate of $14.25 per hour, even though no production dollars were generated during the rest periods. Put simply, all time on the clock was *directly* and *expressly* compensated by Certified Tire at an hourly rate that exceeded the minimum

---

15     The hypothetical situation assumes no overtime hours were worked by either technician during the pay period.

wage.[16]  As we find no merit to plaintiffs' contention that the second technician received no wages at all for the time spent on tasks that did not generate production dollars, we reject plaintiffs' argument that Certified Tire necessarily *borrowed* from other earned compensation to comply with the minimum wage and rest period requirements for the purportedly "uncompensated" hours.

In sum, Certified Tire made payments to its technicians on an hourly basis at an hourly rate that exceeded the minimum wage for all hours worked, and it provided paid rest periods on the clock as required by law. Further, Certified Tire did so without borrowing from wages that were promised under the applicable compensation agreement, as prohibited by *Oman*. (*Oman, supra*, 9 Cal.5th at pp. 781-783.)  Thus, based on the undisputed facts regarding the manner in which technicians were compensated under Certified Tire's TCP, plaintiffs have not established that Certified Tire violated the minimum wage requirement and rest period requirement in Wage Order 4.

---

[16]    For the same reason, there is no merit to the dissent's contention that "Certified Tire's technicians are being paid less than minimum wage—indeed, in many instances they are entirely uncompensated—for working hours that do not generate billed labor dollars."  The dissent's analysis is flawed because it does not acknowledge the role of the guaranteed minimum hourly rate in Certified Tire's compensation system.  Put simply, because of the guaranteed minimum hourly rate assigned to each technician, no technician is ever uncompensated for any work or rest period, and, in fact, each technician is always paid *in excess* of the minimum wage for all such time.

24

## DISPOSITION

The opinion issued by this court on September 18, 2018, is vacated as directed by our Supreme Court.  Upon reconsideration, we affirm the judgment.


IRION, J.

I CONCUR:


HUFFMAN, Acting P. J.

Dato, J., Dissenting.

The California Constitution gives the Legislature the power to provide for minimum wages to be paid to employees. (Cal. Const., art. 14, § 1.) This same constitutional authority has permitted the creation of the Industrial Welfare Commission (IWC), "the state agency empowered to regulate wages, hours and fundamental working conditions for California employees through wage orders governing specific industries and occupations." (*Gonzales v. San Gabriel Transit, Inc.* (2019) 40 Cal.App.5th 1131, 1140, fn. 2.) Currently by statute, employees in this state are generally guaranteed a minimum wage of $14 per hour. (Lab. Code, § 1182.12.) Industry wage orders issued by the IWC guarantee that every employee is paid "at least minimum wage for 'all hours worked in the payroll period.' " (*Oman v. Delta Air Lines, Inc.* (2020) 9 Cal.5th 762, 779 (*Oman*), quoting IWC Wage Order No. 9-2001, § 4.)[1]

In my view, Certified Tire's Technician Compensation Program (TCP) is nothing more nor less than a commission-based compensation system. And it is well settled in California that when an employer elects to pay employees by commission—that is, a percentage of sales generated by the employee—it must "separately compensate" them by paying at least minimum wage for nonproductive time (including rest breaks) that cannot generate compensable sales. (*Vaquero v. Stoneledge Furniture, LLC* (2017) 9 Cal.App.5th 98, 108–114 (*Vaquero*).) Otherwise, the employer has failed to compensate the employee for "all hours worked."

---

[1] The same language appears in wage order No. 4-2001, which the parties stipulated was the wage order applicable to Certified Tire.

1

Here, Certified Tire has sought to disguise a commission compensation system as an hourly rate compensation system. And it has done so using a device that, if approved, would effectively eliminate the requirement that employees be paid for *all* hours worked. Under the TCP, Certified Tire simply calculates the total compensation for the pay period based on that *portion* of the employee's work that generates labor sales dollars, divides that number by the *total hours* worked by the employee to create an effective hourly rate, then multiplies that rate by the same total hour figure to yield the same total compensation it had initially calculated based on only part of the employee's work. The same result is guaranteed because multiplying and then dividing by the same number has the same effect as multiplying by one. Functionally, nothing has changed. Yet, according to Certified Tire, what was an unlawful commission compensation system has been magically transformed into a perfectly lawful hourly rate compensation system. Because I cannot endorse this form-over-substance argument, I respectfully dissent.

## A.

As is typical, California's statutory minimum wage is framed as a minimum hourly rate. Applying that requirement to employee compensation systems not based on hourly rates can pose challenges. As the Supreme Court observed in its recent *Oman* decision, there is often disagreement about "how compliance [with the minimum wage law] is to be measured when the employer does not compensate its employees according to a fixed hourly rate applicable to all hours." (*Oman, supra,* 9 Cal.5th at p. 779.)

In *Oman,* the Supreme Court expressly adopted the "no borrowing" rule first articulated by the Division of Labor Standards Enforcement (DLSE) and consistently endorsed in a variety of Court of Appeal decisions. (*Oman,*

2

*supra,* 9 Cal.5th at p. 779.) As stated in *Oman*, the no-borrowing rule means simply that "[s]tate law prohibits borrowing compensation contractually owed for one set of hours or tasks to rectify compensation below the minimum wage for a second set of hours or tasks, regardless of whether the average of paid and unpaid (or underpaid) time exceeds the minimum wage." (*Id.* at p. 781.) The rule forbids employers from "taking compensation contractually due for one set of hours and spreading it over other, otherwise un- or undercompensated, hours to satisfy the minimum wage." (*Id.* at p. 779.) According to the Supreme Court, this rule applies in a variety of different contexts and "without regard to whether the basis for compensation is hourly (*Sheppard v. North Orange County Regional Occupational Program* (2010) 191 Cal.App.4th 289, 297–298, fn. 5 [(*Sheppard*)]), by piece rate (*Bluford* [*v. Safeway Inc.* (2013) 216 Cal.App.4th 864,] 872 [(*Bluford*)]; *Gonzalez* [*v. Downtown LA Motors, LP* (2013) 215 Cal.App.4th 36,] 51–52 [(*Gonzalez*)]), or by commission ([*Vaquero, supra,* 9 Cal.App.5th at pp. 108–114])." (*Oman*, at p. 781.) In each of the cases approved by the court in *Oman,* employee pay was calculated in a way that emphasized certain work and devalued other tasks. The appellate courts uniformly held that compensation plans which distinguish more productive hours from non or less productive[2] ones violate the no-borrowing rule.

*Vaquero* applied the no-borrowing rule to a commission-based compensation system. In that wage and hour class action, furniture sales associates were paid on a commission basis that "did not provide separate compensation for any nonselling time, such as time spent in meetings, on

---

[2]  "Less productive" in this context refers to hours for which the employer compensates the employee at less than minimum wage even though, in the aggregate, the employee may receive total compensation that exceeds what the minimum wage would guarantee for all hours worked.

3

certain types of training, and during rest periods." (*Vaquero, supra,* 9 Cal.App.5th at p. 103.) Interpreting the applicable IWC wage order, the trial court concluded that the employer was not required "to pay its commissioned employees separately for their rest periods." (*Vaquero, supra,* 9 Cal.App.5th at p. 108.)

The Court of Appeal disagreed and reversed. Relying on the earlier decisions in *Armenta v. Osmose, Inc.* (2005) 135 Cal.App.4th 314 (*Armenta*) and *Bluford, supra,* 216 Cal.App.4th 864, it explained that IWC wage orders "require employers to pay employees for 'all hours,' including nonproductive time, 'at the statutory or agreed rate and no part of this rate may be used as a credit against a minimum wage obligation.' " (*Vaquero, supra,* 9 Cal.App.5th at p. 109, quoting *Armenta, supra,* 135 Cal.App.4th at p. 323; see also *Balasanyan v. Nordstrom, Inc.* (S.D. Cal. 2012) 913 F.Supp.2d 1001, 1005–1006 (*Balasanyan*) [relying on *Armenta* to invalidate a commission compensation system for sales associates]; *Kazi v. PNC Bank, N.A.* (N.D. Cal., Mar. 15, 2021, No. 18-cv-04810 JCS) 2021 U.S. Dist. Lexis 48413, **35–36 (*Kazi*) [post-*Oman* decision utilizing *Armenta* and *Vaquero* to evaluate commission-based compensation for bank loan officers].) Applying this general rule to the commission sales associates, the appellate court held that they must be separately compensated for rest breaks and other nonproductive time during which they were unable to earn commissions.[3]

_____

[3] The commission compensation system in *Vaquero* included a guarantee that the employee would always receive minimum pay of at least $12.01 per hour (an amount in excess of the minimum wage) for all hours worked in any week, even if the employee earned no commission. (*Vaquero, supra,* 9 Cal.App.5th at p. 103.) This guarantee incorporated a "claw back" provision that allowed the employer to recoup some or all of the minimum pay as a future credit if the employee later earned commissions that exceeded the

4

(*Vaquero*, at pp. 110–111; accord *Balasanyan, supra,* 913 F.Supp.2d at p. 1007 ["employees must be directly compensated at least minimum wage for all time spent on activities that do not allow them to directly earn wages"].)

In support of its conclusion, *Vaquero* cited the Court of Appeal decision in *Gonzalez, supra,* 215 Cal.App.4th 36, a case that reached a similar conclusion involving employees paid on a piece-rate basis. (*Id.* at p. 50 [piece-rate compensation system violated Labor Code and applicable wage order because employee "is not paid at all for his nonproductive hours"].) Both *Vaquero* and *Gonzalez* referred to former section 47.7 (now section 47.8) of the DLSE Enforcement Policies and Interpretations Manual (DLSE Manual), which each court found persuasive. (See *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1029, fn. 11.) That section addresses

---

weekly minimum. (*Ibid.*) But in no event would the employee ever receive less than the $12.01 per hour minimum pay for all time worked in any week. (*Ibid.*)

The employer argued that as a result of the guarantee, it was always paying more than minimum wage for all hours worked, including rest breaks. Rejecting this argument, the *Vaquero* court explained that "[t]he problem with [the employer's] compensation system . . . is that the formula it used for determining commissions did not include any component that directly compensated sales associates for rest periods." (*Id.* at p. 114.) Likewise here, the problem with the Certified Tire compensation system is that the TCP does not include anything that "directly compensate[s]" technicians for rest periods and other nonproductive time. Indeed, the express holding in *Vaquero* is that commission-based compensation plans "must separately account and pay for rest periods to comply with California law." (*Id.* at p. 117.)

Unlike the employer in *Vaquero,* Certified Tire does not seek to justify its compensation system by reference to the minimum wage floor question left open in *Oman.* (See fn. 4, *post*.) Instead it simply claims that by virtue of the TCP, it pays an hourly rate in excess of the minimum wage for all hours worked.

5

both commission and piece-rate compensation systems. The current version of that Manual explains:

> "The requirement to be paid at least the minimum wage for all hours worked requires that if, as a result of the directions of the employer, the compensation received by piece rate or commissioned workers is reduced because they are precluded, by such directions of the employer, from earning either commissions or piece rate compensation during a period of time, *the employee must be paid at least the minimum wage . . . for the period of time the employee's opportunity to earn commissions or piece rate [is reduced]*." (DLSE Manual, *supra,* § 47.8, p. 47-4 (rev. Aug. 2019), italics added.)

Noting that "the DLSE Manual treats commissioned and piece-rate employees alike for purposes of applying the minimum wage requirement to nonproductive working hours," *Vaquero* found no rational basis to treat them differently. (*Vaquero, supra,* 9 Cal.App.5th at p. 112.) Employees compensated on either basis must, in addition to their regular compensation, receive separate payment at a rate greater than the minimum wage for all time spent on tasks that do not contribute to generating a commission or piece-rate compensation.[4]

---

[4] The Supreme Court in *Oman* expressed no opinion concerning "a scenario in which a minimum wage floor was written into a contract that otherwise promised pay by the piece," although it noted that the Legislature had since addressed that scenario and "codified for piece-rate workers a statutory right to separate pay, at no less than the minimum wage, for otherwise uncompensated nonproductive and rest time." (9 Cal.5th at p. 788 and fn. 8.) It did, however, cite with approval the same *Gonzalez* decision relied on by the *Vaquero* court, explaining that the piece-rate compensation system in *Gonzalez* "promise[d] pay at a certain rate for certain tasks completed" and that its minimum wage floor "did not alter the nature of that promise." (*Vaquero,* at p. 788.)

B.

A commission is a form of employee compensation based on some measure of performance, often the value of certain sales generated by the employee. Most typically, a commission is calculated as a percentage of the amount paid for goods or services. Certified Tire strenuously maintains that the TCP is *not* a commission-based compensation scheme.[5] It represents that "[t]here is no piece rate pay, commission, or other varying rate of pay that is dependent on the type of work performed." According to Certified Tire, the TCP is merely a formula for calculating an employee's hourly rate of pay, a rate that is paid uniformly "for every hour they're on the clock."

Whether Certified Tire technicians are paid on a commission is not determinative of this appeal. California law is clear that employers are required to pay employees for "all hours worked" *regardless* of how the employee is compensated. And the no-borrowing rule applies with particular

---

It is hardly surprising that both courts and the DLSE treat piece-rate and commission employees identically for purposes of the no-borrowing rule. The compensation plan in *Gonzalez* violated the no-borrowing rule because nonproductive time spent waiting for customers was unaccounted for by the piece-rate system. (*Oman, supra,* 9 Cal.5th at p. 788; see *Gonzalez, supra,* 215 Cal.App.4th at p. 40.) Similarly here, the time spent by Certified Tire technicians performing tasks that do not generate billed labor dollars is unaccounted for by the production-dollar system. As was true in *Gonzalez,* Certified Tire's TCP promises to pay technicians at a certain rate for certain tasks that generate billed labor dollars, and the minimum pay provision "[does] not alter the nature of that promise." (*Oman,* at p. 788.)

[5] Several employees testified at trial that the "tech rate" assigned to employees was referred to internally as their "commission." In contrast, Certified Tire founder and president Jeff Darrow testified that "[n]obody in my company works off commission. Nobody." Reviewing employee records at trial, he denied that a column on the Employee Master File screen labeled "COMM PCT" referred to "commission" percentage. Darrow explained that the percentage figure in that column was the employee's "tech rate."

force whenever the employer's chosen compensation system includes "nonproductive" hours—time spent by employees on work-related tasks (or rest breaks) that do not affect (i.e., increase) the amount of compensation. In such circumstances, the employer must separately compensate the employee for the nonproductive hours.

But make no mistake—Certified Tire's TCP is functionally a commission compensation scheme in which the employee works both productive and nonproductive hours, yet is not separately compensated for the latter. (See *Kazi, supra,* 2021 U.S. Dist. Lexis 48413, *33 ["The incentive compensation at the heart of this case . . . was tied to loan sales, in a manner resembling—if not constituting . . . commissions."].) As explained in the majority opinion, the TCP formula consists of four components. Breaking down those components to show the formula Certified Tire uses to calculate a technician's pay demonstrates the true nature of the compensation scheme:

$$\begin{pmatrix} Production \\ Dollars \end{pmatrix} x \; 0.95 \; x \begin{pmatrix} Tech \\ Rate \end{pmatrix} x \begin{pmatrix} Total \; Hours \\ Worked \end{pmatrix} \div \begin{pmatrix} Total \; Hours \\ Worked \end{pmatrix} = Pay$$

Evaluating the TCP formula, let's start with the first three factors. The first factor, the technician's production dollars, represents "each billed dollar of labor charged to a customer as a result of the technician's work during the pay period." (Maj. opn., *ante,* at p. 4.) In other words, this attempts to measure the value of at least *some* of the technician's work. But there is no dispute that Certified Tire technicians perform a host of required tasks that do not generate any production dollars because the customer is not billed a separate labor charge. In addition, rest breaks necessarily result in

8

no billed labor.  Thus, many of the technician's work hours generate no compensation under the TCP.[6]

The next two factors—the 95 percent figure and the technician's "tech rate" (another percentage between 28 and 34 percent, depending on the employee)—cumulatively result in a percentage figure somewhere between 26.6 and 32.3.  If we stopped with the first three factors, the TCP formula would look like a traditional commission compensation plan, with the technicians earning a commission of roughly 1/4 to 1/3 of only their billed labor for the pay period.

$$\left( \begin{array}{c} Production \\ Dollars \end{array} \right) x\ 0.95\ x\ \left( \begin{array}{c} Tech \\ Rate \end{array} \right) = Commission$$

For example, if a technician generated $5,000 of production dollars in a pay period, and his or her tech rate was 0.30, the commission-based pay would be $1,425.

If Certified Tire paid technicians a simple commission calculated as a percentage of billed labor charges, the compensation scheme would plainly violate the wage order because technicians do not receive separate compensation for rest periods and other nonproductive time.  (*Vaquero, supra,* 9 Cal.App.5th at p. 117; see also *Gonzalez, supra,* 215 Cal.App.4th at p. 40.)  Of course, the TCP doesn't stop with the first three factors.  Instead, the formula provides that the product of the first three numbers (i.e. the commission) will be divided by the employee's total hours during the pay period—ostensibly to create an hourly rate for that period—and then multiplied by the same figure to arrive at the technician's total compensation.

---

[6]     Indeed, the only effect of these nonproductive hours is to *decrease* the employee's calculated hourly rate.

9

$$(Commission) \div \left(\begin{matrix} Total\ Hours \\ Worked \end{matrix}\right) \times \left(\begin{matrix} Total\ Hours \\ Worked \end{matrix}\right) = TCP\ Pay$$

But these last two steps are pure sophistry. They do nothing to change the amount the technician would have earned under a simple percentage commission because dividing and then multiplying by the same number will always yield the original number.[7]

Thus, the TCP formula results in the same compensation for technicians as they would receive under a straight commission based on a set percentage— between 26.6 and 32.3—of the billed labor dollars during the pay period. So why the added and seemingly unnecessary complexity of the TCP formula? I am convinced it is nothing more than a disguise designed to mask a violation of California's minimum wage law.[8]

---

[7] A numerical example illustrates the point. A technician, Sam, with a "tech rate" of 30 percent (.30) has billed labor ("production dollars") of $5,000 during a pay period in which Sam works 40 hours. Sam's effective percentage (.95 x .30) is .285. If Sam were being paid on a traditional commission basis, his commission would be .285 x $5,000 or $1,425 for the period. Under the TCP, however, the $1,425 figure is first divided by 40 hours to create an artificial hourly rate of $35.63 and then multiplied by 40 hours to yield gross pay of $1,425. Of course, it makes no difference how many hours Sam works. If Sam worked 20 hours in order to generate $5,000 production dollars, his hourly rate would double but his gross pay would remain the same. Similarly, if Sam worked 80 hours, his hourly rate would decline to $17.81, but he would still earn $1,425 in gross pay.

[8] The majority opinion attempts to explain the TCP's unnecessary complexity, asserting there is "good reason" to divide and multiply by the same number because it allows Certified Tire to determine, for each particular pay period, whether compensation calculated under the TCP formula is greater than the guaranteed minimum hourly rate. But the complex formula is unnecessary even for this purpose. The relevant question is whether the total compensation for the pay period calculated as a standard

By dividing the already determined gross compensation by the total number of hours worked during a pay period, Certified Tire starts with the desired answer and works backwards. Normally, an hourly wage rate is a means to an end—the employee's gross pay for that pay period. Employees know their hourly rate before they start to work. They then work some number of hours. The number of hours worked is multiplied by the hourly rate to determine their gross pay. Everyone knows in advance what the rules are. The only variable is the number of hours worked.

The TCP makes the hourly rate a moving target. It allows Certified Tire to begin by calculating the gross pay, which is simply the result of applying the technician's percentage (.95 x the tech rate) to the "production dollars" for the pay period. Once the gross pay is established, Certified Tire creates an unnecessary hypothetical hourly rate by dividing the already-determined gross pay by the total hours worked during the pay period. This rate is then applied to the same total hour figure to arrive, not surprisingly, at the same gross pay. The only effect of these mathematical distractions is to allow Certified Tire to claim that it pays its technicians at an hourly rate in excess of the minimum wage for all hours worked. In reality, the TCP merely incorporates within the formula the type of redistributing calculations that are prohibited by the no-borrowing rule.

## C.

If the TCP complies with California's minimum wage law, it will become the universal expedient for employers seeking to evade the no-borrowing rule. A similar device would allow any employer seeking to compensate its employees for only a *portion* of their time to craft a pay

---

commission (production $ x .95 x tech rate) exceeds what the employee would have received based on the minimum hourly wage (total hours x minimum wage).

system it can claim complies with the minimum wage law.  To explain why, let me offer a simple hypothetical involving an hourly rate compensation system.

Assume a retail store operated by Acme Corporation that is divided into two sections—a sales floor accessible to customers and a stockroom, accessible only to employees.  The employees are all salespersons and are currently paid $15 per hour.  Acme decides it wants to incentivize employees to spend more time on the sales floor, where sales are generated.  Each employee's electronic card key, used to access the stockroom area, can also record the amount of time the employee spends on the sales floor.  Using this information, Acme proposes to pay the salespersons $17 per hour for all time spent on the sales floor, but only $13 per hour—$1 less than the minimum wage—for all other time, including rest breaks.[9]

On its face, such a compensation system would violate the minimum wage law because an employer must pay employees at least the minimum wage of $14 per hour "for all hours worked."  (See *Oman, supra,* 9 Cal.5th at p. 782 ["an employer who . . . promises to pay by the hour may not compensate any given hour at less than minimum wage"].)  It makes no difference that the aggregate compensation Acme paid to each employee for each pay period, when divided by the total number of hours during that period, yields an hourly rate that exceeds $14.  (*Ibid.* [employer cannot "make up for the shortfall by pointing to other hours for which contractual compensation exceeds the minimum wage"].)  Allowing Acme to "borrow" compensation attributable to sales floor time so as to raise the effective

---

[9]    Consider a numerical example:  Samantha works 40 hours in a week. 30 hours are spent on the sales floor; 10 are spent in the stockroom and on breaks.  Her compensation for the week will be $510 ($17 x 30 hours) + $130 ($13 x 10 hours) = $640.

hourly rate for nonsales floor time would plainly violate the no-borrowing rule.

Now assume, instead, that Acme introduces a new Salesperson Compensation Program (SCP). Under the SCP formula, a salesperson earns 17 points for every hour spent on the sales floor and 13 points for every other hour. At the end of the pay period, the points for that period are totaled and divided by the employee's total hours to yield the employee's hourly rate for that pay period. The employee is then paid that hourly rate for every hour worked during the pay period.[10]

There is no functional difference between these two examples. The formula used to calculate a variable hourly rate for each pay period allows Acme to borrow compensation in violation of the no-borrowing rule. The points system in the SCP is simply a means to disguise the fact that employees are being paid less than the minimum wage for nonsales floor time. A similar formula could be applied in a similar attempt to validate the violations of the no-borrowing rule that occurred in *Armenta, supra,* 135 Cal.App.4th 314 [utility maintenance employees were not compensated for performing nonproductive tasks] and *Sheppard, supra,* 191 Cal.App.4th 289 [part-time instructors required to work 20 minutes of unpaid preparation time for each hour of classroom instruction].)

---

[10]    Using the same numerical example: Samantha works 40 hours in a week. 30 hours are spent on the sales floor; 10 are spent in the stockroom and on breaks. At the end of the week, Samantha has earned 510 sales floor points and 130 other points, for a total of 640 points. Her 640 points are divided by her 40 hours to yield her hourly rate for the pay period, $16. She is paid for her 40 hours at a uniform rate of $16, resulting in total compensation for the week of $640.

The TCP formula is no different than the hypothetical SCP. It allows Certified Tire to borrow compensation by spreading a technician's pay across all hours worked, both productive hours that generate production dollars and nonproductive hours that do not. In that way, the TCP is simply a means to disguise the fact that Certified Tire's technicians are being paid less than minimum wage—indeed, in many instances they are entirely uncompensated—for working hours that do not generate billed labor dollars. If the TCP complies with minimum wage requirements, then comparable devices would legalize the no-borrowing violations cited by the Supreme Court in *Oman, supra,* 9 Cal.5th at page 781 and condemned by the appellate courts in *Gonzalez, supra,* 215 Cal.App.4th 36 for employees paid on a piece-work basis, *Bluford, supra,* 216 Cal.App.4th 864 for employees paid under an activity-based compensation system, or *Vaquero, supra,* 9 Cal.App.5th 98 for employees paid on commission. In each of those cases, using an accounting device to convert employee compensation that is not based on a "fixed hourly rate applicable to all hours" (*Oman, supra,* 9 Cal.5th at p. 779) into compensation that only appears to be cannot change the fundamental conclusion that the no-borrowing rule has been violated.

D.

Certified Tire's assertion that its technicians are paid a lawful hourly wage for every hour worked is premised on the notion that a math trick imbedded in the TCP formula—dividing and then multiplying by the same number—can transform an invalid commission compensation plan into a lawful hourly rate system.  If this is the law, then the no-borrowing rule just recently accepted and endorsed by our Supreme Court in *Oman* will quickly be replaced by a free-wheeling license to borrow, and the wage order requirement that California employees be paid a minimum wage "for all hours worked" will, for all intents and purposes, evaporate.

DATO, J.